114 A.2d 916 (1955)
Frances B. GREENE and Myron L. Greene, executors under the Last Will and Testament of Louis A. Greene, deceased, Plaintiffs,
v.
George E. ALLEN, Eastman Birkett, Oswald L. Johnston, Floyd B. Odlum, W. C. Rockefeller, and Airfleets, Inc., a Delaware corporation, Defendants.
Court of Chancery of Delaware, New Castle.
June 27, 1955.
Robert C. Barab, Wilmington and Milton Paulson and Paul Roberts, New York City, for plaintiffs.
Henry M. Canby and Louis J. Finger (of Richards, Layton & Finger), Wilmington and Cyrus R. Vance, New York City, for defendants.
SEITZ, Chancellor.
Plaintiffs are executors of the estate of a stockholder who brought this derivative action claiming that Floyd B. Odlum, corporate president and director, with the collaboration of other directors, appropriated a valuable opportunity which should have been acquired for the corporate defendant. This is the decision after final hearing on plaintiffs' right to an accounting.
The corporate defendant Airfleets, Inc. ("Airfleets") was organized in 1948. In February 1952, when the transaction here complained of occurred, Atlas Corporation was its largest single shareholder. This *917 corporation, which is a large investment trust, owned about 18% of Airfleets' stock. Defendant Odlum was president, director and a substantial stockholder of Atlas. At the time he also owned about 6% of Airfleets' outstanding stock and controlled an additional 5% through a controlled corporation.
Since Airfleets was organized Odlum has been its president and a member of its board. The defendant Oswald L. Johnston is a director and vice president and is a partner in the New York law firm of Simpson, Thatcher and Bartlett. This law firm is attorney for Atlas Corporation, Airfleets and Odlum and receives substantial fees from these sources. The defendant Eastman Birkett, the assistant secretary and one of the directors, is associated with the same law firm. Indeed, he was added to the board to facilitate a quorum when necessary and to attend to ministerial matters. The defendant, W. C. Rockefeller, a vice president and director, was formerly Odlum's assistant and was more recently hired as a salaried employee of Atlas Corporation. The defendant, George E. Allen, became a director of Airfleets at Odlum's invitation.
All the individual defendants are nonresidents of Delaware and only Odlum and Johnston have appeared in this action. See Greene v. Johnston, Del., 99 A.2d 627.
By February 1952, Airfleets had disposed of most of the aircraft and other equipment previously acquired and was admittedly in a very liquid position. In fact, the management of Airfleets and Odlum in particular, was looking for appropriate investment opportunities.
The "opportunity" which gave rise to this action involved the purchase by Odlum in early 1952 of certain patents and patent applications owned by Lester E. Hutson. These patents covered a variety of self-locking nuts used primarily in the aircraft industry. In 1950, Hutson had entered into an exclusive patent license agreement with a corporation known as Nutt Shel Company ("Nutt Shel"). All of its stock was owned by Hutson. Under the license agreement, Nutt Shel was authorized to manufacture and sell the patented items in consideration of the payment by Nutt Shel to Hutson of a 5% royalty based on its net sales.
In the fall of 1950, Hutson decided to sell the patents. He testified he wanted to sell in order to realize a capital gain and to increase the liquidity of his estate. He retained an individual to find a purchaser. In the summer of 1951, two interested persons were found. After negotiations it turned out that the prospective purchasers wanted to buy both the patents and stock. The price finally agreed upon for the stock and patents was $5 per share for 20% of the stock with an option to buy the balance at the same price, plus $350,000 for the patents. Also, an exclusive patent license agreement was worked out between the parties. These were arms-length negotiations.
Hutson was unhappy about closing this deal because he wanted all cash. His negotiator then suggested to Hutson that the deal be presented to Odlum. Hutson agreed. The testimony was that the negotiator approached Odlum in his "individual capacity" as a friend and financier. Neither Hutson nor the negotiator had heard of Airfleets. By this time Hutson was willing to sell the patent and rights under the license agreement only if a purchaser could also be found for all or part of the stock. However, he did not care whether the patents and stock were sold to the same or different purchasers. Also, at this time he was concerned with the total purchase price and not with its apportionment between the stock and the patents.
Odlum testified that he was informed by Hutson that it would be inadvisable for a single purchaser to buy both the stock and the patents because much of Nutt Shel's business was subject to renegotiation and the Government might disallow royalty payments from a subsidiary to a parent. Defendants point out that if Airfleets acquired the patents and there was a resultant disallowance of the royalty payments, then the effect would be to increase Airfleets' investment without increasing its profits.
*918 After two conferences Odlum said he would take under advisement the offer to purchase both the patents and the stock. Odlum asked Rockefeller to prepare a financial analysis of the company and to arrange for an engineer of Consolidated Vultee Aircraft Corporation  another so called "Odlum" corporation  to inspect the plant. After receiving these reports Odlum says he decided to accept the offer individually. He testified that he then had no purchaser in mind except himself and that he was financially able to make the purchase. I have no doubt as to his financial ability but I cannot accept his testimony that he was considering the purchase apart from the possibility of "placing" it with one of "his" various interests. Odlum says he then called the defendant Johnston, also the attorney for Airfleets and Odlum individually, and told him about the "purchase" and his desire to close the deal quickly. Johnston recommended a Los Angeles attorney to handle the matter for him.
Odlum testified that after closing the deal orally and before executing any documents he thought more about the tax consequences. It should be noted that Odlum is both a lawyer and a financier of great experience. Since he personally was in the highest income bracket he was looking for capital gains. He said he was not personally interested in the patents because of their descending value and because the royalties would be taxed as ordinary income. After consulting his tax adviser, Odlum decided it was best to place the stock in a corporation with a high excess profits tax base or a tax exempt foundation. He also considered but excluded Atlas Corporation. He then offered it to a company called Pathé Industries. But he withdrew this offer because, as he testified, he decided to forego a capital gain and instead permit Airfleets to buy the stock. This testimony demonstrates how "opportunities" in this phase of the business world cannot be evaluated merely by the mechanical application of principles of the law of corporate opportunity. Consequently, judicial pronouncements made in connection with the disposition of the so called "classic" type of corporate opportunity cases must be carefully evaluated when it is sought to apply them to complicated economic situations created in today's business world.
The deal as formally consummated with the Hutsons was one whereby Airfleets purchased from the Hutsons all of their stock in Nutt Shel for $1,000,000 in cash. At the same time Odlum purchased personally from the Hutsons the patents and patent applications owned by them for $350,000. However, it should be noted that Odlum testified he felt that he had purchased both the stock and the patents and thus he, not Hutson, offered them to Airfleets.
The agreement by Airfleets to purchase the stock was authorized by a meeting of Airfleets' Board of Directors held in California on January 28, 1952. The directors present were Odlum and his two house guests, Johnston and Rockefeller. Odlum did not vote and so the purchase was authorized by the other two directors present.
Immediately after acquiring ownership of the patents for $350,000 Odlum transferred at cost a substantial part of his interest in the patents to a large group of friends and associates in whose welfare he was personally interested. There is no doubt these patent interests were known to be valuable at the time and limited hindsight has shown them to be of great value. The transaction was set forth in a notice of the annual meeting of stockholders and this action followed shortly thereafter.
Plaintiffs seek to have the purchase of the patents by Odlum declared to be a violation of the corporate opportunity doctrine. They make the following contentions:
1. Under the circumstances of this case the opportunity to acquire the Hutson patents was, as a matter of law, a corporate opportunity belonging to Airfleets.
2. As a director of Airfleets, Odlum was absolutely disqualified from acquiring that corporate opportunity, even though Airfleets rejected it. The acquisition by Odlum was a breach of trust.

*919 3. The other directors are also accountable to Airfleets.
Defendants contend first that no corporate opportunity was involved but that in any event the corporation was offered the patents and rejected them in good faith.
Was the possibility of purchasing the patents an opportunity belonging to Airfleets? In approaching this problem I shall assume without deciding that plaintiffs have the burden of showing the corporate opportunity even under present circumstances. Defendants say that there was no such opportunity under the following statement of our Supreme Court in Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A.2d 503, 510:
"It is true that when a business opportunity comes to a corporate officer or director in his individual capacity rather than in his official capacity, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which it has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own, and the corporation has no interest in it, if, of course, the officer or director has not wrongfully embarked the corporation's resources therein."
It is rather easy to apply the quoted language to an executive of a corporation with a rather well defined sphere of business activity. But that is not this case. I agree with defendant that the purchase of the patents was not "essential" to Airfleets in any realistic sense. I shall also assume that it was not one in which the corporation had an "expectancy". But plaintiffs assert and I agree that the opportunity was one in which Airfleets had an "interest" in the sense that through Odlum it was actively seeking valuable investments and this was one at a price which Airfleets could reasonably afford to finance. In so stating I realize that the voting directors felt to the contrary, but, as hereafter indicated, I cannot conclude that their decision was the result of the exercise of business judgment of the character required under the circumstances. I state this conclusion without deciding whether it is necessary to a finding of a corporate opportunity or whether it is relevant only to a decision as to a "good faith" rejection.
I therefore conclude that the opportunity to purchase the patents was an opportunity which "belonged" to Airfleets. The fact that the offer came to Odlum in his so called "individual" capacity does not alter my conclusion. The character of the opportunity in law does not rest upon so narrow a base. Rather, it depends upon broader considerations of fiduciary duty. The "formal" acceptance of an opportunity as an individual matter cannot convert a corporate opportunity into an individual one. As the Supreme Court said in Guth v. Loft, above:
"The question is not one to be decided on narrow or technical grounds, but upon broad considerations of corporate duty and loyalty."
At the very time this transaction was presented to him, Odlum was under an obligation to find such opportunities for Airfleets. Nor is this conclusion so terrible as defendants suggest. Is it too much to ask that the chief executive of a company seeking investment possibilities for its liquid capital be required to make available to his corporation pertinent opportunities coming to his attention? After all, sellers  particularly for cash  are not generally concerned with the identity of a purchaser. Odlum was approached because he was a "financier" and that reputation came about in part from his executive control of Air fleets even though its specific identity was unknown to the seller and his agent.
Any other approach would permit a person so situated to "pick and choose" between the corporation and his personal interests even though the stockholders and other directors might well entertain a "different" view as to the wisdom of his decision. Moreover, the rule of fiduciary conduct to be adopted should tend to encourage action on behalf of the corporation. To give conclusive legal effect to the origin of the *920 original approach would have a contrary tendency. I conclude that this opportunity under the circumstances belonged to Airfleets and must be evaluated accordingly.
I need not consider plaintiffs' further contention that when Airfleets purchased the stock Odlum, in effect, used corporate money to help "swing" the package deal and thus came squarely within the principle of the Guth case that a corporate opportunity exists if corporate funds are used.
Defendants next urge that in any event the opportunity to purchase the patents was offered the Board of Airfleets and rejected by them fairly and in good faith.
Having established the corporate opportunity, was Odlum absolutely disqualified from acquiring it even though Airfleets rejected it? It seems to me that where an opportunity comes to a corporation and its acceptance or rejection calls for the exercise of "business judgment" then at least in that situation a person in Odlum's fiduciary relationship to the corporation is disqualified from taking it for himself. Otherwise, those owed the fiduciary duty would practically never be able to demonstrate a case of bad faith because they would be called upon to attack an essentially subjective evaluation by the directors. It is to avoid just such a problem that at least in this limited situation a court will protect the beneficiaries by preventing the directors' decision from being "colored" by the knowledge  as here  that one of its members desires to take the opportunity for himself. Compare Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121.
Here a mere statement of the factors which purportedly influenced the two directors in rejecting the opportunity to purchase the patents will demonstrate the illusory nature of the protection which will be afforded stockholders if the test is merely "business judgment". Thus the questions as to whether the additional $350,000 should be invested and the risk of renegotiation losses taken would normally be a proper matter for a board of directors to consider. But who is to say what were the deciding factors when the directors in considering them knew that Odlum felt that Airfleets should not buy the patents and that he intended to "keep" them for himself. It is to remove just such conflict where a fiduciary is concerned that the law applies more exacting standards  and properly so.
But even assuming that good faith is a defense, I do not believe the burden of so showing under the circumstances was adequately met. And I say this without intending to reflect on the subjective motives of the directors. It was perfectly evident to me that Odlum dominated and controlled those members of Airfleets' board who decided to "reject" the offer to purchase the patents. I use "dominate and control" in the sense that, criminality aside, his wishes were their commands. My conclusion is drawn from the inter-play of several circumstances; some tangible and others intangible: The two directors who voted to reject the offer are both, realistically speaking, beholden to Odlum; Odlum was and is Airfleets' president and a member of its board; the manner in which the corporate affairs were handled as among the board members showed that realistically this was a one-man board  an Odlum board. Nor is my conclusion affected by the subsequent director ratification. And I emphasize that my conclusion is based not merely on the manner in which the various director relationships were created but on the cumulative effect of the trial record.
Having concluded that we are dealing with a corporate opportunity, and assuming that defendants are free to assert good faith as a defense, I believe the reasons advanced for the rejection of the offer by Airfleets' dominated board are legitimate matters for judicial scrutiny. This is even more true where, as here, the fiduciary seeks to show a good faith rejection of a corporate opportunity by a dominated board with the president the known beneficiary of their rejection. I also believe a heavy burden of proof is on Odlum to show such a rejection. This is not the ordinary case where a court is not free to disturb the honest business judgment of directors.
*921 Plaintiff makes some point of the fact that the so called offer was not formally rejected by Airfleets but I believe the legal consequence of this transaction must stand or fall on a broader approach.
According to defendants the decision of the directors not to buy the patents for Airfleets was based on the following reasons:
(1) The expenditure of 55% of the net assets of Airfleets was required for the purchase of the stock and an additional 19% was required for the purchase of the patents; this would commit about 75% of the net assets of the company in a single venture; in view of the desire for diversification of investment, it was felt that it would be unwise to commit the additional amount required for the purchase of the patents.
(2) The patents would be relatively unmarketable.
(3) One million dollars was all that should be committed in the venture at this time in light of the fact that Nutt-Shel was in a highly competitive field and engaged primarily in war work;
(4) Even if it should be deemed advisable to invest additional funds in the Nutt-Shel picture, such funds would be best employed in furthering the expansion of the company.
(5) The possibility that a part of the return on the patents might be taken away on renegotiation if Airfleets acquired both stock and patents.
The two basic reasons advanced for the so called rejection of the opportunity by the board were (1) the risk that the royalty payments might not be considered separately when Airfleets' profits were renegotiated, and (2) in any event, $1,000,000 was all that should be invested in the transaction.
As to renegotiation, the fact is and the directors must have known that for some time this very close arrangement existed as to the Hutsons and yet they had not suffered thereby. Also, the substantial value of the patents was then quite evident and the so called renegotiation risk only applied to government work. Even then private work formed a substantial part of Airfleets' business.
As to the question of the desirability of investing the $350,000, I must say that it was just not persuasive to me in the light of Airfleets' asset picture at the time. Actually, Airfleets then had readily usable assets having a value of $3,800,000. Here any attempt to make a significant distinction between "cash" and "net assets" is without substance. Defendants conceded of necessity that the investments were temporary because they indicated themselves that they were awaiting "investment opportunities" with no predisposition as to the type of investment.
The other "reasons" advanced for the rejection were largely afterthoughts in my opinion. The defendants' suggestion that the enterprise was somewhat speculative fails to impress me in view of the fact that Odlum saw fit to let his close associates invest their own money in the same enterprise.
Therefore, assuming without deciding that the good faith of the directors in rejecting an offer is a defense under these circumstances, I am compelled to conclude that Odlum and the other directors failed to sustain the burden of showing a good faith rejection in the sense that it was influenced by factors unrelated to Odlum's "interest".
We thus have a situation where an opportunity of great value was available to Airfleets at relatively small cost ($350,000) at a time when the "interest" and means were present. Yet, it was rejected by the members of the board in favor of the very individual who dominated and controlled them. Indeed, Odlum had told the directors he did not think Airfleets should buy the patents. It will not do to say that Mr. Odlum did not need the money and that he immediately reassigned much of the patent interest at cost to other parties. The fact is that this advantageous sale was a means whereby Mr. Odlum satisfied certain "felt" obligations to friends and associates of his own or of his wife. This cannot justify the *922 diversion of a valuable opportunity from those entitled to it, namely, all of the stockholders of Airfleets. Nor will it help to say that by such action the court of necessity finds that Odlum hurt himself because he was also a stockholder of Airfleets. To a man of his means and position, this cannot be given the same probative value as in the ordinary case because he obtained a benefit of perhaps even greater value to himself.
I therefore conclude that in any event defendants failed to sustain the burden of showing a good faith rejection of the offer under the circumstances of this case. It follows that I find an improper diversion of an opportunity belonging to Airfleets.
Plaintiffs also briefed the proposition that the other directors as well as Odlum are accountable to Airfleets. Defendants did not brief this point and so I shall hear counsel as to the disposition of this point prior to the entry of the order hereon. I assume that the measure of the directors' liability is also an open question.