Irving **FLIEGLER**, Plaintiff below,
Appellant,

v.

John C. **LAWRENCE** et al., Defend-
ants below, Appellees.

Supreme Court of Delaware.

Submitted Oct. 15, 1975.

Decided June 28, 1976.

Steven D. Goldberg of Theisen, Lank & Mulford, Wilmington, and Barry H. Singer of Pollack & Singer, New York City, of counsel, for plaintiff below, appellant.

R. Franklin Balotti and Stephen E. Herrmann of Richards, Layton & Finger, Wilmington, and Warren M. Weggeland, Salt Lake City, Utah, of counsel for defendants below, appellees, John C. Lawrence and Fred H. Tresher.

Edward B. Maxwell of Young, Conaway, Stargatt & Taylor, Wilmington, for defendant below, Agau Mines, Inc.

Before DUFFY and McNEILLY, JJ., and CHRISTIE, Judge.

McNEILLY, Justice:

In this shareholder derivative action brought on behalf of Agau Mines, Inc., a Delaware corporation, (Agau) against its officers and directors and United States Antimony Corporation, a Montana corporation (USAC), we are asked to decide whether the individual defendants, in their capacity as directors and officers of both corporations, wrongfully usurped a corporate opportunity belonging to Agau, and whether all defendants wrongfully profited by causing Agau to exercise an option to purchase that opportunity. The Court of Chancery found in favor of the defendants on both issues. (1974). Reference is made to that opinion for a full statement of the facts; what follows here is but a brief resume of the events giving rise to this litigation.

I

In November, 1969, defendant, John C. Lawrence (then president of Agau, a publicly held corporation engaged in a dual-phased gold and silver exploratory venture) in his individual capacity, acquired certain antimony properties under a lease-option for $60,000.[1] Lawrence offered to

---

1. Antimony is a metallic element used in a wide variety of alloys, especially with lead in battery plates, and in the manufacture of flame-proofing compounds, paints, semiconductors and ceramic products.

transfer the properties, which were then "a raw prospect", to Agau, but after consulting with other members of Agau's board of directors, he and they agreed that the corporation's legal and financial position would not permit acquisition and development of the properties at that time. Thus, it was decided to transfer the properties to USAC, (a closely held corporation formed just for this purpose and a majority of whose stock was owned by the individual defendants) where capital necessary for development of the properties could be raised without risk to Agau through the sale of USAC stock; it was also decided to grant Agau a long-term option to acquire USAC if the properties proved to be of commercial value.

In January, 1970, the option agreement was executed by Agau and USAC. Upon its exercise and approval by Agau shareholders, Agau was to deliver 800,000 shares of its restricted investment stock for all authorized and issued shares of USAC. The exchange was calculated on the basis of reimbursement to USAC and its shareholders for their costs in developing the properties to a point where it could be ascertained if they had commercial value. Such costs were anticipated to range from $250,000. to $500,000. At the time the plan was conceived, Agau shares traded over-the-counter, bid at $5⁄8 to $3⁄4 and asked at $1 to $1¼. Applying to these quotations a 50% discount for the investment restrictions, the parties agreed that 800,000 Agau shares would reflect the range of anticipated costs in developing USAC and, accordingly, that figure was adopted.

In July, 1970, the Agau board resolved to exercise the option, an action which was approved by majority vote of the shareholders in October, 1970. Subsequently, plaintiff instituted this suit on behalf of Agau to recover the 800,000 shares and for an accounting.

II

The Vice-Chancellor determined that the chance to acquire the antimony claims was a corporate opportunity which should have been (and was) offered to Agau, but because the corporation was not in a position, either financially or legally, to accept the opportunity at that time, the individual defendants were entitled to acquire it for themselves after Agau rejected it.

We agree with these conclusions for the reasons stated by the Vice-Chancellor, which are based on settled Delaware law. *Equity Corp. v. Milton,* Del.Supr., 221 A.2d 494 (1966); *Guth v. Loft, Inc.,* Del.Supr., 23 Del.Ch. 255, 5 A.2d 503 (1939); also see *Wolfensohn v. Madison Fund, Inc.,* Del.Supr., 253 A.2d 72 (1969). Accordingly, Agau was not entitled to the properties without consideration.

III

Plaintiff contends that because the individual defendants personally profited through the use of Agau's resources, *viz.,* personnel (primarily Lawrence) to develop the USAC properties and stock purchase warrants to secure a $300,000. indebtedness (incurred by USAC because it could not raise sufficient capital through sale of stock), they must be compelled to account to Agau for that profit. This argument pre-supposes that defendants did in fact so misuse corporate assets; however, the record reveals substantial evidence to support the Vice-Chancellor's conclusion that there was no misuse of either Agau personnel or warrants. Issuance of the warrants in fact enhanced the value of Agau's option at a time when there was reason to believe that USAC's antimony properties had a "considerable potential", and plaintiff did not prove that alleged use of Agau's personnel and equipment was detrimental to the corporation.

Nevertheless, our inquiry cannot stop here, for it is clear that the individual defendants stood on both sides of the transaction in implementing ánd fixing the terms of the option agreement. Accordingly, the burden is upon them to demonstrate its intrinsic fairness *Johnston v. Greene,* Del.Supr., 35 Del.Ch. 479, 121 A.2d 919 (1956); *Sterling v. Mayflower Hotel Corp.,* Del.Supr., 33 Del.Ch. 293, 93 A.2d 107 (1952); *Gottlieb v. Heyden Chemical Corp.,* Del.Supr., 33 Del.Ch. 82, 90 A.2d 660 (1952); *David J. Greene & Co., v. Dunhill International, Inc.,* Del.Ch., 249 A. 2d 427 (1968). We agree with the Vice-Chancellor that the record reveals no bad faith on the part of the individual defendants. But that is not determinative. The issue is where the 800,000 restricted investment shares of Agau stock, objectively, was a fair price for Agau to pay for USAC as a wholly-owned subsidiary.[2]

### A.

Preliminarily, defendants argue that they have been relieved of the burden of proving fairness by reason of shareholder ratification of the Board's decision to exercise the option. They rely on 8 Del.C. § 144(a)(2) and *Gottlieb v. Heyden Chemical Corp.,* Del.Supr., 33 Del.Ch. 177, 91 A. 2d 57 (1952).

In *Gottlieb,* this Court stated that shareholder ratification of an "interested transaction", although less than unanimous, shifts the burden of proof to an objecting shareholder to demonstrate that the terms are so unequal as to amount to a gift or waste of corporate assets. Also see *Saxe*

*v. Brady,* 40 Del.Ch. 474, 184 A.2d 602 (1962). The Court explained:

"[T]he entire atmosphere is freshened and a new set of rules invoked where formal approval has been given by a majority of independent, fully informed [share]holders." 91 A.2d at 59.

The purported ratification by the Agau shareholders would not affect the burden of proof in this case because the majority of shares voted in favor of exercising the option were cast by defendants in their capacity as Agau shareholders. Only about one-third of the "disinterested" shareholders voted, and we cannot assume that such non-voting shareholders either approved or disapproved. Under these circumstances, we cannot say that "the entire atmosphere has been freshened" and that departure from the objective fairness test is permissible. Compare *Schiff v. R. K. O. Pictures Corp.,* 37 Del.Ch. 21, 104 A.2d 267 (1954), with *David J. Greene & Co. v. Dunhill International, Inc., supra,* and *Abelow v. Symonds,* 40 Del.Ch. 462, 184 A.2d 173 (1962). In short, defendants have not established factually a basis for applying *Gottlieb.*

Nor do we believe the Legislature intended a contrary policy and rule to prevail by enacting 8 Del.C. § 144, which provides, in part:

(a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors

---

2. The date at which this transaction must be scrutinized for intrinsic fairness is critical to the resolution of this question. We agree with the Vice-Chancellor that as of January 28, 1970, when the option was formally executed, that the transaction was one which would have commended itself to an independent corporation in Agau's position. *Johnston v. Greene, supra.* However, we are not concerned so much with Agau's *acquisition* of the option, but rather with the *exercise* thereof and implementation of its terms. In other words, the focus must be on the actual exchange of Agau's stock for USAC's stock and the test is whether that which Agau received was a fair *quid pro quo* for that which it had to pay. Since that exchange did not and could not, in fact occur until shareholder approval had been given in October, 1970, we must examine the transaction as of that point in time.

or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

(1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board of committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(2) The material facts as his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

(3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee, or the shareholders.

Defendants argue that the transaction here in question is protected by § 144(a)(2) [3] which, they contend, does not require that ratifying shareholders be "disinterested" or "independent"; nor, they argue, is there warrant for reading such a requirement into the statute. See Folk, *The Delaware General Corporation Law—*

*A Commentary and Analysis* (1972), pp. 85–86. We do not read the statute as providing the broad immunity for which defendants contend. It merely removes an "interested director" cloud when its terms are met and provides against invalidation of an agreement "solely" because such a director or officer is involved. Nothing in the statute sanctions unfairness to Agau or removes the transaction from judicial scrutiny.

### B.

Turning to the transaction itself, we note at the outset that from the time the option arrangement was conceived until the time it was implemented, there occurred marked changes in several of the factors which formed the basis for the terms of the exchange. As of the critical date, the market value of Agau shares had risen and shares were being traded at about $3.00 per share; thus, while initially the maximum discounted market value of the 800,000 was considered to be $500,000, by the time in question it was $1.2 million. Development expenses, originally anticipated to range from $250,000.–$500,000., but as actually incurred, were towards the lower end of that scale. Further, while only equity investment was anticipated as the means of raising the capital to finance exploration and development, an original subscriber for 1,500 shares for $250,000. cancelled his subscription and USAC found itself unable to obtain sufficient capital through sale of stock; thus it was forced to borrow $300,000., the debt being secured by USAC property as well as by Agau stock purchase warrants.[4] It also appears that only $83,000. in cash was actually received through sales of stock.

---

3. They also argue that since defendant-director Dawson was not "interested" and since he approved acquiring the option, the transaction falls under the protection of § 144(a)(1). However, Dawson, who was the only disinterested director, did not participate at the Board meeting in which it was resolved to

*exercise* the option; and it is with that decision which we are now concerned.

4. These warrants apparently were demanded by the lenders because of Agau's option rights in USAC and were issued *after* the Agau Board of Directors had resolved that the option be exercised.

■ On the basis of these changed conditions and in light of the fact that the exchange price was originally calculated simply to reimburse the USAC shareholders for their costs, plaintiff argues that the issuance of 800,000 shares of Agau stock, having a market value of at least 1.2 million dollars, to acquire a corporation in which only $83,000 in cash had been invested, and whose property was subject to loans of $300,000, is patently unfair.

The difficulty with this argument for purposes of the fairness test is that it impermissibly attempts to equate and compare two different standards of value (if indeed USAC's debt/equity ratio is a standard of value) in order to demonstrate the inadequacy of the consideration Agau received. See *Sterling v. Mayflower Hotel Corp., supra.* In fact, a reference to market sales of the stock involved, might support a finding of fairness. It appears that, although USAC was closely held, there was one arms-length sale of 75 USAC shares to non-affiliated investors for $160. per share. At this rate, the value of the 10,000 USAC shares would be 1.6 million, $400,000. more than the value of the shares given up by USAC. Furthermore, the market value of Agau's stock, even discounted, is an unrealistic indicator of the true value of what Agau gave up as it was clearly inflated due to Agau's possession of the option to acquire USAC whose properties were increasing in value largely as a result of the time and efforts expended by the individual defendants. As stated by the Vice-Chancellor:

"Thus, I think it is without question that if Lawrence and the other defendant shareholders of USAC had not granted the option to Agau, the value of the consideration originally established would not have risen. In other words, the very fact that Agau had the option increased the value of the consideration it was committed to give in the event it chose to exercise it, and this, in turn, was due to the fact that as USAC continued its efforts it became increasingly obvious that it had something that Agau would want to acquire."

The book value of 800,000 Agau shares reinforces this conclusion. Saleable assets (at cost less depreciation) less liabilities (excluding accrued salary due Lawrence) yielded an equity totaling about $113,000. On this basis, the 800,000 shares, which when issued represented a 28.6% interest in the corporation,[5] thus had a value of about $32,000. In this sense, Agau paid little; but, USAC's book position was no better, with assets and liabilities about equal. This comparison, however, is likewise unrealistic for it ignores the true value of USAC's most valuable asset, the antimony properties themselves. While the properties were carried on the books at cost ($60,000.), the record indicates their value was considerably higher. In late 1969 or early 1970, when the properties were still considered to be a "raw prospect", USAC received two offers (subsequently confirmed in writing) of $200,000. for a 50% interest in the properties and their future development and yield. Further, Lawrence, a qualified expert, testified that in his opinion, the properties had a net value of between 3.5–70 million dollars as of August 31, 1970.

Viewing the two corporations as going concerns from the standpoint of their current and potential operational status presents a clearer and more realistic picture not only of what Agau gave up, but of what it received.

Agau was organized solely for the purpose of developing and exploring certain properties for potentially mineable gold and silver ore. The bulk of its cash, raised through a public offering, had been ex-

5. Prior to the exchange, there were approximately two million shares outstanding. Adding to that the 800,000 shares paid to defendants, their consequential share was 800,000/2,800,000, or 28.57%.

pended in "Phase I" exploration of the properties which failed to establish a commercial ore body, although it did reveal "interesting" zones of mineralization which indicated to Lawrence that "Phase II" development and exploration might eventually be desirable. However, plans for further development had been temporarily abandoned as being economically unfeasible due to Agau's lack of sufficient funds to adequately explore the properties, as well as to the falling market price of silver. It further appears that other than a few outstanding unexercised stock purchase warrants, Agau did not have any ready sources of capital. Thus, as the Vice-Chancellor found, had the option not been exercised, Agau might well have gone out of business.

By comparison, the record shows that USAC, while still considered to be in the exploratory and development stage, could reasonably be expected to produce substantial profits. At the time in question, the corporation had established a sizeable commercial ore body, had proven markets for its product, and was in the midst of constructing a major ore separation facility expected to produce a high grade ore concentrate for market.

An admittedly "conservative" report submitted in June, 1970, by Pennebaker, an independent geologist retained by USAC, confirmed the presence of a sizeable ore body and projected for the corporation a three-year net pre-tax profit of $660,000. after deducting all costs from ground to market including property payments, a complete return of the capitalized construction costs of the ore separation facility and $120,000 per year for further exploration and development.[6] Without allowing for capital return and exploration and development costs, he projected a three-year profit

of $1,357,500. He noted further that his projections were based on only 50% recovery by the proposed separation facility; the remaining 50% not thereby recovered would be recoverable at a later date by another facility planned to be constructed for this purpose. Likewise a metallurgy report by defendant Snyder, projected a sizeable positive cash flow once production got underway.

The record does suggest that if the properties were to be immediately profitable, the market value for antimony would have to remain relatively high; however, Pennebaker, after noting this potential problem, stated that he was encouraged by the long-term purchaser offers USAC had already received and accordingly concluded that USAC should proceed with the plant construction as planned. Further, Lawrence stated that any mining venture is by its very nature speculative in that its success or failure largely depends upon the whims and vagaries of the metals market. It appears that at the time in question, consumption and demand for domestic antimony were rising.

■ The only evidence offered by plaintiffs on the fairness question consisted of Agau's annual reports for the years 1971 and 1972, and a 1973 proxy statement. These documents are immaterial to the issue before us since we are concerned only with the situation as it existed at the time of the transaction. *Johnston v. Greene, supra.*

■ Considering all of the above factors, we conclude that defendants have proven the intrinsic fairness of the transaction. Agau received properties which by themselves were clearly of substantial value. But more importantly, it received a promising, potentially self-financing and

---

6. We note here that while Agau did take USAC subject to a $3000,000 long-term debt, the loan proceeds were used in part to pay off the balance due on USAC's lease-option on the properties and to finance construction of the ore separation facility; and as indicated

above, these expenditures were anticipated to be recovered through before-profit product sale receipts. In other words, it was apparently anticipated that the loans would be paid off from gross product income.

profit generating enterprise with proven markets and commercial capability which could well be expected to provide Agau at the very least with the cash it sorely needed to undertake further exploration and development of its own properties if not to stay in existence. For those reasons, we believe that the interest given to the USAC shareholders was a fair price to pay. Accordingly, we have no doubt but that this transaction was one which at that time would have commended itself to an independent corporation in Agau's position.

Affirmed.