**ROBERT A. WACHSLER, INC., a Connecticut corporation, Plaintiff-Appellee,**

v.

**FLORAFAX INTERNATIONAL, INC., a Delaware corporation, Defendant-Appellant.**

**No. 83–1214.**

United States Court of Appeals, Tenth Circuit.

Nov. 26, 1985.

Ira L. Edwards, Jr., Houston & Klein, Inc., Tulsa, Okl. (Drew R. Heard and John T. Helm of Shank, Irwin & Conant, Dallas, Tex., on brief), for defendant-appellant.

Joel L. Wohlgemuth (Janet Spaulding also of Prichard, Norman & Wohlgemuth, with him on brief), Tulsa, Okl., for plaintiff-appellee.

Before BARRETT and LOGAN, Circuit Judges, and SAFFELS, District Judge.*

LOGAN, Circuit Judge.

In this diversity action defendant Florafax International, Inc. appeals a $240,000 judgment rendered against it in a jury trial for breach of contract brought by plaintiff Robert A. Wachsler, Inc. (RAW). Florafax

* Honorable Dale E. Saffels, United States District Judge for the District of Kansas, sitting by designation.

is a publicly held Delaware corporation with its principal place of business in Oklahoma. RAW is a closely held Connecticut corporation with its principal place of business in Connecticut.

The issues on appeal are (1) whether Oklahoma or Delaware corporate law governs this suit; (2) concluding, as we do, that Delaware law controls, whether Del. Code Ann. tit. 8, § 144 is the exclusive means of ratifying interested director contracts; and (3) if not, whether the jury verdict that Florafax did ratify the contract with RAW may be upheld under the standards that would then properly apply.

Robert A. Wachsler is a marketing consultant who served on the board of directors of Florafax. He is president of RAW and, together with his wife, owns all of RAW's stock. RAW's principal business is marketing Wachsler's personal consulting services. For a short time before Wachsler and Michael Lupo, president and chief executive officer of Florafax, signed the contract in question, RAW had been receiving $3,500 per month from Florafax for serving as a marketing consultant. At this time, other Florafax directors also were receiving fees from the corporation under agreements that did not have formal advance approval of the board of directors.

In June 1980, Wachsler brought a draft of a proposed agreement between Florafax and RAW to a Florafax marketing meeting. The contract provided that RAW would supply consulting services to Florafax for five years for a $60,000 annual fee. Wachsler discussed the contract with Lupo and Richard Hughes, Florafax's chairman. Lupo signed the contract on behalf of Florafax some time before June 26, although it was never presented to or approved by the board of directors. On that date apparently all the board of directors members together owned or controlled no more than 36.8% of Florafax's outstanding voting stock.[1]

1. See Proxy Statement of Florafax International, Inc., 1980, Pl.Ex. 11 at 4–5 (1,996,567 voting shares outstanding and board members owned 735,436 of those shares).

On June 26 Hughes announced to the Florafax board of directors by way of a conference telephone call that he had sold his Florafax stock to Joseph Hale, who on that day became the new chairman of the board and chief executive officer of Florafax. Lupo remained as Florafax's president and chief operating officer. Hale soon learned of the consulting agreement with RAW, and at a meeting with Lupo and Wachsler on July 22, he informed Wachsler that Florafax would not honor the contract. Lupo then sent RAW a letter dated August 22, 1980, in which he referred to the minutes of an April 9 board of directors meeting that purported to preclude contracts made without prior board approval.[2]

Wachsler resigned from the Florafax board on November 4. The remaining directors, with the exception of Lupo, resigned shortly thereafter. On November 24, 1980, a new board composed of Hale, Lupo, and two new directors formally disavowed the contract with RAW. Florafax never paid any fees to RAW under the contract.

Soon after Wachsler's resignation from the board, RAW brought suit for breach of contract. The complaint alleged that Florafax had ratified the contract when its president Lupo asked RAW in June 1980 to provide a major marketing analysis of the method by which Florafax could increase the sale of silk flowers to gift shops and then utilized this analysis in marketing Florafax products. Florafax denied ratification and claimed to have returned all copies of the marketing analysis without ever using it. Nevertheless there was some evidence at trial from which the jury could have found that Florafax in fact used some of RAW's marketing ideas.

## I

The parties initially contested the issue of whether Oklahoma or Delaware law is applicable to this suit. At trial, however, neither party objected when the district court applied Oklahoma law, apparently because the relevant statutes of the states are substantively identical.[3] We are convinced that Delaware law should be applied to determine the questions at issue here, and we rely primarily on the relevant statute and cases from that state. Nonetheless, we have examined the Oklahoma authorities cited, and, although that state's law is not as fully developed, we are convinced that the Oklahoma and Delaware supreme courts would arrive at the same conclusion.[4]

Sitting as a federal court in a diversity case, we must apply the substantive law that an Oklahoma state court would apply, including that state's choice of law rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Although there is no recent Oklahoma Supreme Court decision directly on point, we are convinced that an Oklahoma court would

---

**2.** The board of directors' minutes of April 9, 1980, contained the following statement, made when the corporation was considering hiring a senior vice-president under a two year contractual arrangement:

"Members of the Board express serious reservations about the company entering into any further contractual management employment agreements without advance approval from the Board, and Mr. Hughes indicated that management's policy would be not to make any such arrangements, even informally, until such time as Board approval had been secured, in the future."
Pl.Ex. 5

**3.** *Compare* Okla.Stat.Ann. tit. 18, § 1.175a *with* Del.Code Ann. tit. 8, § 144.

**4.** The relevant cases, if we were to apply Oklahoma law, are *Eastern Oklahoma Television Co. v. Ameco, Inc.*, 437 F.2d 138 (10th Cir.1971); *East Central Oklahoma Elec. Coop., Inc. v. Oklahoma Gas and Elec. Co.*, 505 P.2d 1324 (Okla. 1973); *Mechanical Constructors, Inc. v. B–W Acceptance Corp.*, 412 P.2d 957, 959–60 (Okla. 1966); *Clyserol Laboratories, Inc. v. Smith*, 362 P.2d 99, 102–03 (Okla.1961); *Harrison v. Commander Mills, Inc.*, 298 P.2d 749, 752–53 (Okla. 1956); *Oklahoma City General Hosp. v. Weathers*, 147 Okl. 25, 294 P. 98, 100 (1930); *Illinois Oil Co. v. Pender*, 137 Okl. 82, 277 P. 1026, 1028–29 (1928); *Cardin Bldg Co. v. Smith*, 125 Okl. 300, 258 P. 910, 913 (1927); *Cassidy v. Hornor*, 86 Okla. 220, 208 P. 775, 780 (1922); *Bentley v. Zelma Oil Co.*, 76 Okla. 116, 184 P. 131, 140–41 (1919).

apply the choice of law rules of the *Restatement (Second) of Conflicts of Law* (1971) in a case such as this. *See Collins Radio Co. v. Bell,* 623 P.2d 1039, 1046–47 (Okla.App.1980) (court "guided" by *Restatement (Second)* rules on choice of law in contract questions arising under but not fully answered by Article 2 of the Uniform Commercial Code); *White v. White,* 618 P.2d 921, 923–24 (Okla.1980) (*Restatement (Second)* used as guide in tort choice of law cases); *Brickner v. Gooden,* 525 P.2d 632, 637 (Okla.1974) (same).

Section 301 of the *Restatement (Second)* generally applies when a choice of law involves corporate acts of a sort that can likewise be done by an individual, such as making contracts, committing torts, and receiving and transferring assets. *See Restatement (Second) of Conflicts of Law* § 301, comment b. Section 302(2), however, governs matters peculiar to corporate status and internal affairs, such as the rules regarding a corporation's relationship to its shareholders, the election or appointment of directors and officers, and the like. *See id.* § 302, comment a; *see also* Kozyris, *Corporate Wars and Choice of Law,* 1985 Duke L.J. 1, 24–26. That section provides that the law of the state of incorporation shall be applied to determine issues involving the rights and liabilities of a corporation, unless it is shown that some other state has a more significant relationship to the occurrence and the parties. *Restatement (Second) of Conflicts of Law* § 302(2).

Oklahoma cannot claim to have a more significant relationship than Delaware to the question of the validity of an interested director contract. Applying Delaware law in this case ensures certainty, predictability, and uniformity of result in internal corporate matters. It more nearly satisfies the needs of interstate systems, protects the justified expectations of the parties involved, and provides a rule of law more easily determined. *See id.* § 302, comment e. Corporations incorporate in a specific state precisely because they desire to avail themselves of that state's corporate laws. *Id.* Any rule not looking to the law of the state of incorporation could lead to potential chaos. *See* Kozyris, 1985 Duke L.J. at 49. If the validity of a corporation's assent to an interested director contract depended on the law of the state where each contract was negotiated, the same corporation might have to follow radically different ratification/approval procedures for each one, depending on how stringent the various requirements were in each state that the contract might affect. A provision in the law of the state of incorporation, such as Del.Code Ann. tit. 8, § 144, would then be meaningless, unless the corporation only conducted business in states with equivalent or less stringent provisions for validating interested director contracts or conducted business only in the incorporating state.

Because the issue in this case concerns a peculiar question of contract affirmation that arises only when a corporation is one party to the contract, Delaware law should govern this issue. Therefore, as a federal court we pretend to sit as an Oklahoma state court applying Delaware law.

## II

Applying Delaware law, the first substantive issue is whether Del.Code Ann. tit. 8, § 144, which pertains to interested director contracts, is the exclusive means by which these contracts may be validated. Section 144(a) provides:

"§ 144. **Interested directors; quorum.**

(a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, ... if:

(1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the con-

tract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

(3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee or the shareholders."

The parties stipulated at trial that the board of Florafax never approved the disputed contract nor did the shareholders ratify the agreement. Nevertheless, the district court ruled that the Oklahoma law equivalent to Del.Corp.Code § 144 was merely a statutory safe harbor, and that additional common law means of ratification remained. Accordingly, the court submitted the question of common law ratification to the jury with an instruction concerning RAW's burden of proving fairness and good faith. The jury rendered a general verdict in favor of RAW and awarded $240,000 damages for the contract breach.

█ Although we conclude that Delaware law should have formed the basis for these instructions, we do not read the Delaware statute as setting out the sole means of ratification. The terms of § 144 are phrased negatively; § 144 states only that no interested director contract will be void or voidable, *solely* because an interested director is involved, if certain conditions are met. The statute thus does not define, in absolute terms, all the steps that can in fact validate interested director contracts.

The Delaware Supreme Court explained § 144 in *Fliegler v. Lawrence*, 361 A.2d 218 (Del.1976). It held that § 144 "merely removes an 'interested director' cloud when its terms are met and provides against invalidation of an agreement 'solely' because such a director or officer is involved." *Id.* at 222. The court concluded that satisfying the terms of § 144 did not necessarily validate the contract. The party seeking to uphold the contract must still establish that the contract terms are intrinsically fair to the corporation. *Id.* at 222, 224.

The facts of the case before us are the converse of those in *Fliegler.* Here, too, the substantive requirements of fairness apparently were satisfied,[5] but Florafax took no procedural steps to ratify the contract, and its board in fact formally repudiated it.

We read *Fliegler* as neither defining § 144 as an outright safe harbor provision nor construing it as the exclusive means for validating interested director contracts. *Fliegler* said that compliance with § 144 procedural requirements removed the cloud of interested director contracts. This can be read to hold that formal approval of such interested contracts using the procedures of § 144 is a necessary but not sufficient step of validation. But we believe *Fliegler* does not rule out other ways for removing the cloud of wrongdoing, such as common law ratification of the interested director contract.

### III

Resorting to Delaware common law for additional guidance, we find that Delaware courts once viewed interested director contracts as presumptively fraudulent unless expressly authorized or ratified by the stockholders. *See Potter v. Sanitary Co.,*

---

5. This assumes that the Delaware courts would allow such a fairness determination to be made by the jury, as occurred here. There is dictum in one Delaware decision characterizing this question as a legal one, to be decided by the court. *See Gottlieb v. Heyden Chemical Corp.,* 33 Del.Ch. 177, 91 A.2d 57, 58 (Del.1952). The court stated that when fairness is questioned, "the court will usually have no choice but to employ its own judgment in deciding the perhaps very close and troublesome questions as to whether the evidence shows that the directors used the utmost good faith and the most scrupulous fairness." *Id.*

22 Del.Ch. 110, 194 A. 87, 91 (1937). More recent authority characterizes such contracts as voidable. *Michelson v. Duncan,* 407 A.2d 211, 218–19 (Del.1979). The Delaware courts have consistently recognized formal ratification by a majority of shareholders as the principal means of removing the taint of director self-dealing from such transactions. *See id.; Kerbs v. California Eastern Airways,* 33 Del.Ch. 69, 90 A.2d 652, 655 (1952).

Yet nowhere do we find the Delaware courts holding that a formal shareholder vote is the exclusive means of ratifying voidable corporate acts. In dictum in at least one case the Delaware courts appear to have endorsed ratification by mere shareholder acquiescence in the face of full knowledge of material facts. *See Cahall v. Lofland,* 12 Del.Ch. 299, 114 A. 224, 234 (1921), *aff'd,* 13 Del.Ch. 384, 118 A. 1 (1922).[6]

General corporate text writers have recognized several methods of corporate ratification of interested director contracts. One leading commentator states: "[C]ontracts and other transactions between two corporations having directors or other officers in common … are, generally, not absolutely void, but, at the most, merely voidable, and may be rendered binding by ratification or acquiescence on the part of the *stockholders.*" 3 W. Fletcher, *Cyclopedia of Private Corporations* § 979 (1975) (emphasis added) (footnote omitted). The Delaware courts, in factual settings not involving interested director contracts, have recognized that corporate ratification can occur when a corporation simply accepts the benefits of an otherwise unauthorized agreement. *Fisher v. Safe Harbor Realty Co.,* 38 Del.Ch. 297, 150 A.2d 617, 619 (1959); *Wilmington Provision Co. v. Sinskey,* 31 Del.Ch. 311, 72 A.2d 446, 449 (1950).

Although it appears that the Delaware courts endorse less formal means of corporate ratification, we believe that when the taint is at the board level ratification must occur at the shareholder level. 3 W. Fletcher, *supra,* § 979 (1975); *see generally Cahall v. Lofland,* 114 A. at 232 (high salaries set by board with no disinterested members; held that, absent statutory, charter, or bylaw provision, approval of shareholders is necessary to validate board action). Indeed, following Delaware common law, only the *disinterested* shareholders are capable of "freshen[ing]" the atmosphere after corporate self dealing. *See Fliegler,* 361 A.2d at 221.

The district court here, applying Oklahoma law, instructed the jury that benefit retention alone was sufficient to ratify the disputed contract. We believe these instructions failed in two respects: First, in not specifically requiring full knowledge of the material facts by the shareholders in so ratifying; and second, in not directing the ratification determination down to the shareholder level. The district court instead allowed ratification "so far as the facts are known or ought to be known to the person or the corporation accepting the same." R. I, 397.

Nevertheless, we need not remand for a new trial and more precise factual instruction. The record shows that, even with factual assumptions highly favorable to RAW, the majority of Florafax's shareholders had no knowledge of the material facts of RAW's contract sufficient to ratify the contract by acquiescence or by willing acceptance of the benefits therefrom. *Cf. Michelson v. Duncan,* 407 A.2d at 220 ("Shareholder ratification is valid only where the stockholders so ratifying are adequately informed of the consequences of their acts and the reasons therefor.").

**6.** Common sense tells us that shareholder ratification without a shareholder vote must be possible. If 100% of the Florafax stock was owned by its directors, and all directors clearly knew and approved of the RAW contract and allowed the corporation to accept the contract's benefits, it would be extremely difficult to say there had not been a ratification. This would be true despite the lack of either a formal board vote or a formal shareholder vote.

Assuming that every member of the board who held Florafax shares had full knowledge of RAW's interested director contract with Florafax, and could be considered as either acquiescing or knowingly accepting its benefits sufficient to ratify,[7] at most this would constitute no more than 36.8% of the total voting shares.[8] Even if informal ratification by shareholders holding a majority of the voting shares, without regard to their disinterestedness, is enough to satisfy the law's requirements, here owners of more than 63% of Florafax's voting shares apparently did not know of RAW's contract. RAW's contract was negotiated in May and June of 1980 and agreed to by Wachsler and Lupo on June 16. In November 1980 the Florafax board officially repudiated the contract after Lupo gave RAW written notice of Florafax's repudiation on August 22, 1980. Florafax did not distribute any proxy statements or annual reports to its shareholders during this period that would have sufficiently provided notice of this contract. Nor do the corporate minutes mention this transaction except the board's repudiation of it.

■ We therefore believe that remand for retrial is not justified because we are convinced that RAW cannot establish that a majority of Florafax shareholders ratified, however that term is defined, RAW's contract with Florafax. We believe that, in the absence of traditional notice to shareholders during the time in which RAW's contract was negotiated, signed, and repudiated, RAW cannot carry its burden of proving informed majority shareholder ratification. Accordingly, the contract remained voidable and Florafax's decision to disavow it did not entitle RAW to a remedy for breach of contract.

REVERSED and REMANDED.

---

**7.** The record is clear that three of the five members of the Florafax board of directors were aware of RAW's contract prior to the time Florafax sought to disavow it: Hughes (who was then chairman), Wachsler (who was also president of RAW), and Lupo (who was president of

Florafax). Lupo testified that he had no knowledge of whether the remaining two directors were aware of RAW's contract with Florafax.

**8.** See note 1 *supra*.

---

Francisco Eugenio **MARTINEZ**,
Plaintiff-Appellant,

v.

Fred M. **WINNER**, Chief Judge of the United States District Court for the District of Colorado, individually and in his official capacity; Joseph M. Dolan, United States Attorney for the District of Colorado, individually and in his official capacity; Susan Roberts, Assistant United States Attorney, individually and in her official capacity; John R. Barksdale, Assistant United States Attorney, individually and in his official capacity; Dan Christopher, Assistant United States Attorney, individually and in his official capacity; Jan Chapman, Assistant United States Attorney, individually and in her official capacity; United States Department of Justice, a governmental entity; Federal Bureau of Investigation, a governmental entity; "John Doe" and other unnamed and unknown agents in the Denver Office of the Federal Bureau of Investigation, individually and in their official capacities; Matt Dunn, Deputy United States Marshal, individually and in his official capacity; Peyton Baer, Deputy United States Marshal, individually and in his official capacity; Les Weisenhorn, Deputy United States Marshal, individually and in his official capacity; City and County of Denver, a governmental entity; Dale A. Tooley, District Attorney for the City and County of Denver, individually and in his official capacity; Castelar Garcia, Jr., Deputy District Attorney, individually and in his official capacity; City of Denver Police Department, a governmental entity; Arthur Dill, Chief of Police, individually and in his official capacity; Robert Shaughnessy, Chief, City of Denver Police Department, individually and in his official capacity;

Robert Nicoletti, Captain, Denver Police Department, individually and in his official capacity; J.C. Tyus, Detective, Denver Police Department; "John Does," and other unnamed and unknown agents of the Denver Police Department; Sandy Spencer and Peter Webb, Defendants-Appellees.

No. 82–2110.

United States Court of Appeals, Tenth Circuit.

Submitted Nov. 18, 1985.

Decided Nov. 29, 1985.

Adele Graham of Graham & Graham, Denver, Colo., and David Graham of Graham & Graham, San Luis, Colo. (Dan Stormer of Litt & Stormer, Los Angeles, Cal., and James I. Meyerson, New York City, with them on brief), for plaintiff-appellant.

Gary T. Cornwell of McGuire, Cornwell & Blakely, Denver, Colo., for defendant-appellee Winner.

Mark B. Stern, Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C. (Richard K. Willard, Acting Asst. Atty. Gen., Barbara L. Herwig, Dept. of Justice, Washington, D.C., and Robert N. Miller, U.S. Atty., Denver, Colo., with him on brief), for defendants-appellees Dolan, Roberts, Barksdale, Chapman, Christopher, Dept. of Justice, F.B.I., Dunn, Baer and Weisenhorn.

Daniel J. Sears of Denver, Colo., for defendant-appellee Spencer.

Jeffrey A. Chase of Holme, Roberts & Owen, Denver, Colo. (Carol H. Green of Holme, Roberts & Owen, Denver, Colo., with him on brief), for defendant-appellee Webb.

David R. Brougham of Hall & Evans, Denver, Colo., for defendants-appellees Tooley and Garcia.

John R. Flanders of Halaby & McCrea, Denver, Colo. (Theodore S. Halaby and Leslie L. Schluter of Halaby & McCrea, Denver, Colo., and Steven M. Munsinger of Keene, Munsinger & Stuckey, Denver, Colo., with him on brief), for defendants-appellees City and County of Denver, City of Denver Police Dept., Dill, Shaughnessy, Nicoletti and Tyus.

Before LAY,* Chief Judge, and BRIGHT* and ARNOLD,* Circuit Judges.

---

* The Honorable Donald P. Lay, Chief Judge, United States Court of Appeals for the Eighth Circuit, and the Honorable Myron H. Bright and the Honorable Richard S. Arnold, United States

---

Circuit Judges for the Eighth Circuit, sitting by designation.