GRIES SPORTS ENTERPRISES, INC. ET AL., APPELLANTS, *v.*
CLEVELAND BROWNS FOOTBALL CO., INC. ET AL., APPELLEES.

[Cite as Gries Sports Enterprises, Inc. *v.* Cleveland Browns Football Co.
(1986), 26 Ohio St. 3d 15.]

(No. 85-704—Decided August 20, 1986.)

16

*Ulmer, Berne, Laronge, Glickman & Curtis* and *Marvin L. Karp,* for appellants.

*McNeal, Schick, Archibald & Biro* and *Robert D. Archibald,* for appellee Cleveland Browns Football Co., Inc.

*Jones, Day, Reavis & Pogue, Patrick F. McCartan, Robert C. Weber* and *Katherine B. Jenks,* for appellees Bailey, Berick, Cole and Modell et al.

WISE, J.   The issue to be decided by this court is whether or not the record contains any competent, credible evidence which supports the findings of the trial court that the board of directors of the Browns could not successfully claim the protection of the business judgment rule and, therefore, with the presumption stripped away, whether the evidence supports the finding of the trial court that the acquisition of CSC was not intrinsically fair to the corporation and its minority shareholders.

The other issue to be considered is whether or not the trial court erred in not compelling GSE's and Gries' law firm to provide Cole access to the papers he was seeking.

I

The appellees-directors herein claim that they are protected by the presumption of good faith and fair dealing that arises from the business judgment rule and, therefore, they do not have the burden of proving that their decision to purchase CSC was intrinsically fair to the Browns' minority shareholders.

The issue before us, then, centers on the applicability of the business judgment rule. The business judgment rule is a principle of corporate

governance that has been part of the common law for at least one hundred fifty years.[3] It has traditionally operated as a shield to protect directors from liability for their decisions. If the directors are entitled to the protection of the rule, then the courts should not interfere with or second-guess their decisions. If the directors are not entitled to the protection of the rule, then the courts scrutinize the decision as to its intrinsic fairness to the corporation and the corporation's minority shareholders. The rule is a rebuttable presumption that directors are better equipped than the courts to make business judgments and that the directors acted without self-dealing or personal interest and exercised reasonable diligence and acted with good faith. A party challenging a board of directors' decision bears the burden of rebutting the presumption that the decision was a proper exercise of the business judgment of the board.

The parties have agreed that Delaware law is applicable to this dispute and they both focus on the recent case of *Aronson* v. *Lewis* (Del. 1984), 473 A.2d 805. In *Aronson,* the Delaware Supreme Court set forth the rule at 812:

"* * * The business judgment rule is an acknowledgement of the managerial prerogatives of Delaware directors under Section 141(a). See *Zapata Corp.* v. *Maldonado,* 430 A.2d at 782. It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. *Kaplan* v. *Centex Corp.,* Del. Ch., 284 A.2d 119, 124 (1971); *Robinson* v. *Pittsburgh Oil Refinery Corp.,* Del. Ch., 126 A. 46 (1924). Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption. See *Puma* v. *Marriott,* Del. Ch., 283 A.2d 693, 695 (1971)."

The *Aronson* court also set forth the elements of the rule which must be satisfied in order for the rule to be invoked:

"First, its protections can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment. From the standpoint of interest, this means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally. *Sinclair Oil Corp.* v. *Levien,* Del. Supr., 280 A.2d 717, 720 (1971); *Cheff* v. *Mathes,* Del. Supr., 199 A.2d 548, 554 (1964); *David J. Greene & Co.* v. *Dunhill International, Inc.,* Del. Ch., 249 A.2d 427, 430 (1968). See also 8 Del. C. § 144. * * *

"Second, to invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material infor-

---

[3] Arsht, The Business Judgment Rule Revisited (1979), 8 Hofstra L. Rev. 93.

mation reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties. * * *" *Id.* at 812.

While the business judgment rule protects directors from personal liability in damages, it also applies to cases of "transactional justification," where an injunction is sought against board action, or against a decision itself, in which case the focus is on the decision as contrasted with the liability of the decision maker. There is a distinction between a "transactional justification" case involving or affecting the decision itself and the protection from personal liability of the decision maker. The former is sometimes referred to as involving the business judgment "doctrine," and the latter the business judgment "rule."[4]

The business judgment rule is a tool of judicial review, not a standard of conduct. When the director's personal liability in damages is at issue, the Delaware Supreme Court has stated:

"* * * While the Delaware cases use a variety of terms to describe the applicable standard of care, our analysis satisfies us that under the business judgment rule director liability is predicated upon concepts of gross negligence. * * *" *Aronson, supra,* at 812.

However, when the justification of a particular transaction is at issue, such as in the case at bar, the language of the cases suggests a standard of judicial review whereby the court must weigh the objective reasonableness of the business decision. See *Unocal Corp.* v. *Mesa Petroleum Co.* (Del. 1985), 493 A.2d 946. Further, the Delaware Supreme Court has held, where the elements of the rule are satisfied in a "transactional justification" case, that decisions of disinterested directors "will not be disturbed if they can be attributed to any rational business purpose." *Sinclair Oil Corp.* v. *Levien* (Del. 1971), 280 A.2d 717, at 720.

We conclude that the lengthy record, consisting of documents filling

---

[4] See Hinsey, Business Judgment and the American Law Institute's Corporate Governance Project: the Rule, the Doctrine, and the Reality (1984), 52 Geo. Wash. L. Rev. 609, 611-613:

"Courts and commentators have generally overlooked the distinction between the business judgment rule and the business judgment doctrine (or the 'doctrine'). This has resulted in unfortunate misunderstanding and confusion. The business judgment *rule* shields individual directors from liability for damages stemming from decisions, whereas the business judgment *doctrine* protects the decision itself. The doctrine recognizes the legitimacy of the board as a decision maker and the substantial judicial deference to be accorded thereto. Yet, the essential elements of the rule and doctrine are the same. This commonality of attributes has undoubtedly contributed to the widespread tendency to overlook the distinction. * * *

"* * *

"* * * The need for two separate concepts—and their use with greater precision—becomes clear when one recognizes that in a given case the doctrine may be unavailable, but the rule may shield certain directors from liability." (Emphasis *sic.*) (Footnotes omitted.)

nine boxes, 15" x 12" x 10" each, including a transcript of proceedings 3,309 pages long, contains substantial, competent and credible evidence to support the trial court's findings.

We now examine the record in accordance with Delaware law to determine whether the Browns' directors can claim the protection of the business judgment rule (or doctrine). In a stockholders' derivative action challenging the fairness of a transaction approved by a majority of directors of a corporation, a director must be (1) disinterested, (2) independent and (3) informed in order to claim the benefit of the business judgment rule. If a director fails to pass muster as to any one of these three, he is not entitled to the business judgment presumption. This does not mean that the director's decision is necessarily wrong; it only removes the protection provided by the business judgment presumption. Once this presumption is removed, the court must then inquire into the fairness of the director's decision. The loss of the protection of the presumption does not result in a director becoming personally liable. In a case where the focus is upon the liability of the director for a decision, rather than on the decision itself, as in the case at bar, the director cannot be found personally liable unless the court, after finding the decision to be unfair, finds the director was grossly negligent. See *Aronson, supra.*

Under Delaware law, (A) a director is interested if (1) he appears on both sides of a transaction or (2) he has or expects to derive personal financial benefit not equally received by the stockholders; (B) a director is independent if his decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences; a director is not independent when he is dominated by or beholden to another person through personal or other relationships; and (C) a director is informed if he makes a reasonable effort to become familiar with the relevant and reasonably available facts prior to making a business judgment.

## I

### A1

Browns' directors, Modell, Gries, Bailey, Berick, Cole and Wallack, all were stockholders in CSC. Modell, Gries, and Berick were also stockholders in the Browns as well. Modell was the fifty-three percent majority stockholder in the Browns and the eighty percent majority stockholder in CSC (one hundred percent after March 2, 1982).

The Delaware law is that when the transaction "* * * involves insiders dealing with their corporation the test of validity of the transaction is fairness. That our courts have frequently so held is without question. Thus in *Sterling* v. *Mayflower Hotel Corp.,* 33 Del. Ch. 20, 93 A.2d 107, the Supreme Court said: 'Since they stand on both sides of the transaction, they bear the burden of establishing its entire fairness.' And in *David J. Greene & Co.* v. *Dunhill International,* Del. Ch., 249 A.2d 427, the

Chancellor stated that it is unquestionably the substance of our decisions that 'when the persons, *be they stockholders or directors,* who control the making of a transaction and the fixing of its terms, are on both sides, then the presumption and deference to sound business judgment are no longer present.' * * *'' (Emphasis added.) *Puma v. Marriott* (Del. Ch. 1971), 283 A.2d 693, 695.

We note that in *Puma, supra,* at 695, the Delaware court found that: "* * * There is no testimony which even tends to show that the terms of the transaction were dictated by the Marriott Group or any member thereof. On the contrary, the valuations of the property companies and the Marriott stock were made by a majority of Marriott directors, whose independence is unchallenged, *based upon appraisals, analysis, information and opinions provided by independent experts, whose qualifications are not questioned.* In these circumstances it cannot be said that the Marriott Group stood 'on both sides of the transaction' within the meaning of the rule followed in the case above cited. * * *'' (Emphasis added.)

How different the facts are in the case at bar! The trial court concluded: "* * * In the instant case, no arms length negotiations as to price, terms, the elements to be included (or not to be included), or any other aspect of the proposed acquisition ever took place between the Browns and CSC. The $6,000,000 price was arrived at by Messrs. AMA [Modell], Bailey and Poplar in the Fall of 1981, prior to any disclosure to plaintiffs of the possibility of such an acquisition, and never changed despite plaintiff's objections and despite the valuations furnished the defendants by plaintiffs. The manner in which the subject transaction was initiated, structured, negotiated and disclosed to plaintiffs therefore did not satisfy any reasonable concept of fair dealing.''

In *Fliegler v. Lawrence* (Del. 1976), 361 A.2d 218, the Delaware Supreme Court held that where a number of persons owned stock and held positions in both corporations, "it is clear that the individual defendants stood on both sides of the transaction in implementing and fixing the terms of the option agreement'' by which one corporation acquired the other. "Accordingly, the burden is upon them to demonstrate its intrinsic fairness." *Id.* at 221. See, also, *Rabkin v. Phillip A. Hunt Chemical Corp.* (Del. 1985), 498 A.2d 1099, 1106: "When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.''

The court of appeals' majority acknowledges that Cole was an interested director and that an "effective argument can be made that, under Delaware statutory law, Bailey's dual positions with the Browns and CSC established that he was an interested director when he voted in favor of the CSC acquisition." Bailey was an officer and general counsel for both the Browns and CSC as well as being a director for the Browns at the time

of the acquisition. The record is replete with evidence that supports the trial court's finding that Bailey and Modell "initiated, structured, negotiated and set the price for the sale of the CSC" and, under Delaware law, Bailey was clearly "an interested director."

The Delaware Supreme Court in *Weinberger* v. *UOP, Inc.* (Del. 1983), 457 A.2d 701, at 711, defined "fair dealing" as embracing "* * * questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the director and the stockholders were obtained. * * *" This definition was also cited in *Rabkin* v. *Phillip A. Hunt Chemical Corp., supra,* at 1104.

We conclude, and so hold, that the evidence supports the finding that the Browns' directors, Bailey and Cole, "stood on both sides of the transaction" as a result of their holding stock and/or positions in both corporations and that Bailey and Berick's law firm structured and negotiated the sale of CSC to the Browns, along with Modell.

## I

## A2

We also conclude and hold that the evidence supports the trial court's finding that Browns' directors, Bailey, Berick, Cole and Wallack, were "interested" because they had received a personal financial benefit from the challenged transaction. Mindful of Justice Frankfurter's admonition that we must not be ignorant as judges of what we know as men, *Watts* v. *Indiana* (1949), 338 U.S. 49, 52, we hold that the evidence establishes that the redemption of the CSC minority stock was part and parcel of the sale of CSC to the Browns. "Directorial interest exists whenever * * * a director * * * *has received* * * * a personal financial benefit from the challenged transaction which is not equally shared by the stockholders." (Emphasis added.) *Pogostin* v. *Rice* (Del. 1984), 480 A.2d 619, 624.

While Gries and GSE received the same $120 a share for their CSC stock as did the other CSC minority stockholders, as a result of Gries and GSE owning forty-three percent of the Browns' stock, the Browns' acquisition of CSC resulted in Gries' and GSE's acquiring forty-three percent of a $14,000,000 increased debt.

## I

## B

Judge Corrigan, writing for the appellate court majority, while admitting that "* * * [a]s outside counsel for the Browns, *it was Berick's job to do what Modell requested*" (emphasis added), went on to say:

"The trial court based its finding that Berick was beholden to Modell solely on the fact that Berick was the Browns' outside legal counsel. Such a finding was clear error."

The judge cites *Piccard* v. *Sperry Corp.* (S.D.N.Y. 1943), 48 F.Supp. 465, as authority. *Piccard* is inapposite to the case at bar. In that case, a

federal judge was deciding Delaware law of 1936, and the law of Delaware then was quite different than the present Delaware "safe harbor" statute, 8 Del. Code Ann. Section 144.

In *Piccard,* the minority stockholder brought suit, alleging that certain directors were "interested directors" and could not be counted so as to constitute a quorum and, therefore, no vote could be taken on the proposed transaction whether it was fair or not. The question of whether or not the business judgment rule presumption did or did not apply to the attorney-director was never considered. The federal court held that under Delaware law, an attorney, working for the corporation of which he was also a director, was not an "interested director" so as to be disqualified for quorum purposes from voting. The court then concluded the action taken by the board was fair. The present Delaware statute provides that a transaction may be approved by a board of directors by the affirmative votes of the majority of the disinterested directors, even though the disinterested directors be less than a quorum. 8 Del. Code Ann. Section 144(a)(1). See, also, 8 Del. Code Ann. Section 144(b):

"Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transaction."

Section 144 was passed by the Delaware Legislature following the rendering of the decision in *Piccard.*

In *Johnston* v. *Greene* (Del. 1956), 121 A.2d 919, a case we think more applicable to the facts of the case at bar, the Delaware Supreme Court held that a transaction between a dominating director and his corporation is subject to strict scrutiny, and the director has the burden of showing the transaction was fair. In *Johnston,* the transaction was the rejection by the board of directors of Airfleets, Inc. of an opportunity to buy certain patents which the president of Airfleets purchased in his own right after the rejection by the board. Members of the board of directors present in authorizing the transaction were Floyd Odlum, Oswald Johnston, and W.C. Rockefeller. Odlum was president and director of Airfleets; also, he was director and substantial stockholder of Atlas Corporation which was the largest single shareholder of Airfleets. Johnston was a director and vice-president of Airfleets and a partner in the New York law firm of Simpson, Thatcher & Bartlett, which firm was the attorney for Atlas Corp., Airfleets and Odlum. Rockefeller was a vice-president and director and was formerly Odlum's assistant and, at the time of the transaction, a salaried employee of Atlas Corp. Only Johnston and Rockefeller voted on the transaction. The Delaware trial court found that those circumstances resulted in a "dominated and controlled" board of directors and, therefore, the transaction was subject to strict scrutiny by the courts and that the directors had the burden of showing that the transaction was fair. *Greene* v. *Allen* (Del. Ch. 1955), 114 A.2d 916. The trial court stated at 920:

"* * * I use 'dominate and control' in the sense that, criminality aside, his wishes were their commands. * * *"

On appeal, the Delaware Supreme Court, in *Johnston* v. *Greene, supra,* stated at 922:

"* * * The Chancellor found that Odlum dominated the other directors and that the decision not to acquire the patents was his. *This finding we accept."* (Emphasis added.)

We find in the case at bar, since it was Berick's job to do what Modell requested, then, under Delaware case law, he was "dominated and controlled" and the decision was that of Modell and not his. Thus, Berick was dominated and not independent.

## I

## C

Having concluded that the evidence abundantly supports the trial court's finding that the directors were neither disinterested nor independent, we need not belabor the third requirement that the directors must be informed. However, our reading of the record does not convince us that the directors were adequately informed under Delaware law. But it is not necessary for the resolution of this case that this court expound upon the standard of care to be utilized when determining whether or not the directors had "informed" themselves. We leave that intriguing issue for resolution by the proper forum at the proper time.

## II

We have concluded that all of the Browns' directors voting in favor of the CSC acquisition were "interested" by virtue of their having received a personal financial benefit from the sale of their CSC stock. However, assuming *arguendo* that the two-step sale of CSC to the Browns was not a single, necessarily related transaction, we nevertheless must conclude that, of the four directors voting in favor of the acquisition, three were clearly "interested" and/or dominated. Cole, Bailey and Berick were not disinterested, independent directors so as to be protected by the business judgment presumption. Both the trial court and the court of appeals agreed that Cole was interested and dominated. Similarly, the appellate court recognized that Bailey's dual positions as an officer and general counsel for both corporations made him an "interested" director. See *Fliegler, supra.* Furthermore, it was Bailey and Berick's law firm that, along with Modell, structured and negotiated the sale of CSC to the Browns. See *Rabkin, supra;* and *Weinberger, supra.* Berick was outside counsel for the Browns and was, as the trial court found, a dominated director who did not act independently. Since "it was Berick's job to do what Modell requested," it is obvious that he was dominated and controlled by Modell. See *Johnston* v. *Greene, supra.*

Having determined that the evidence clearly supports the conclusion

that the transaction was not approved by a majority of disinterested and independent directors, we must look to see if the evidence supports the trial court's conclusion that the transaction was intrinsically unfair to the minority shareholders, Gries and GSE. A transaction not given protection by the business judgment rule is subject to strict scrutiny, and the directors have the burden of showing the transaction was fair. *Johnston* v. *Greene, supra,* at 925.

In determining intrinsic fairness, the transaction will be examined as of the date on which it was accomplished. See *Fliegler* v. *Lawrence, supra,* at 221, fn. 2. The burden was on the directors-defendants to demonstrate that the $6,000,000 was a fair price. The trial court found, and the evidence supports the trial court's finding, that:

"26. As a direct result of the acquisition—wherein the Browns borrowed $6,000,000 in order to purchase the stock of CSC and thereby acquire 100% ownership of a corporation which had outstanding indebtedness of $8,000,000—the total indebtedness of the Browns was, in effect, increased $14,000,000.

"* * *

"33. Rather than serving the best interests of the Browns and all of the Browns' stockholders, the effect of this transaction was to benefit the majority stockholder of the Browns (who thereby reduced his own ownership interest in the assets and liabilities of CSC from 80% to 53%) at the expense of the principal minority shareholders (who, as a consequence, saw their interest in such assets and liabilities increase from 7% to 43%)."

We hold that the evidence supports the trial court's conclusion of law No. 7 that:

"Defendants failed to sustain their burden of proving that the transaction was intrinsically fair to the corporation and to the minority shareholders."

## III

The appellate court majority concluded that "[t]he trial court erred in not compelling * * * [CSC's and Gries'] law firm to provide Cole access to the papers he was seeking." We disagree. The evidence fails to disclose any relevant relationship between the files requested and the issues involved in this litigation. The trial court did not commit reversible error in refusing to order the law firm representing GSE and Gries to disgorge its files and materials arising out of the representation of Cole and others, including plaintiffs, during the period 1975-1982. Cole never stated, with any degree of specificity, what documents he wanted, or why he wanted them; he simply asserted he needed to review all of the documents relating to Ulmer, Berne, Laronge, Glickman & Curtis' representation of GSE, Gries and others, in order to defend his interest in the pending litigation. Cole was never called to testify at trial nor was there ever any showing of relevancy. Therefore, assuming, *arguendo,* that there was error commit-

ted by the trial court in overruling the motion to compel, it would certainly constitute harmless error:

"In order to support reversal of a judgment, the record must show affirmatively not only that error intervened but that such error was to the prejudice of the party seeking such reversal." *Smith* v. *Flesher* (1967), 12 Ohio St. 2d 107, paragraph one of the syllabus.

The judgment of the court of appeals is reversed, and the judgment of the trial court is reinstated.

*Judgment reversed.*

CELEBREZZE, C.J., SWEENEY and C. BROWN, JJ., concur.

C. BROWN, J., concurs separately.

HOLMES, DOUGLAS and WRIGHT, JJ., dissent.

WISE, J., of the Fifth Appellate District, sitting for LOCHER, J.

CLIFFORD F. BROWN, J., concurring. The painstaking and thorough analysis of the complicated corporate transactions and activities by the Browns and CSC, and the correct application of Delaware corporate law thereto, compel my concurrence as a member of the majority.

In my view we should focus on the undisputed facts that the Browns' directors were neither disinterested nor independent. The trial court correctly so determined, based on competent, reliable evidence, with which we should agree. The vote of the Browns' directors to approve the Browns' purchase of CSC stock was four to one, Bailey, Berick, Cole and Wallack voting yes, and only Gries voting no. Bailey, Berick, Cole and Wallack all were directors of the Browns at the time of the acquisition of CSC. These four at that time were minority stockholders of CSC and each received $120 dollars per share for his CSC stock, which was far in excess of an earlier option to sell such shares back to the corporation for $32 per share. Each of these four directors was an interested director because he received a financial benefit from the challenged corporate transactions of CSC and the Browns. The March 2, 1982 redemption of CSC stock for $120 per share from the four yes directors of the Browns was part of one structured corporate program whereby the Browns two weeks later on March 16, 1982, purchased the outstanding CSC stock held by Modell. See *Pogostin* v. *Rice* (Del. 1984), 480 A. 2d 619, 624; *Aronson* v. *Lewis* (Del. 1984), 473 A. 2d 805.

Since the purchase of the CSC stock by the Browns was not approved by a majority of disinterested Browns' directors, the CSC stock purchase is not protected by the Delaware business judgment rule. That rule provides that a party challenging a board of directors' decision bears the

burden of rebutting the presumption that the decision was a proper exercise of the business judgment of the board.

In view of the foregoing facts that the four Browns' directors voting yes on the CSC stock purchase were not disinterested directors because they received a special financial benefit as described above from the challenged CSC stock purchase, the following items in several dissenting opinions are irrelevant to the issues. One critic states that Gries failed to show how the business affiliation between Modell and Berick, or Modell and Wallack, prevented them from basing their decisions on the best interests of the corporation. Director Berick's performance of legal services for the Browns is mentioned, but this is not the basis for the determination that Berick is not a disinterested director. The fact that the record regarding Wallack "shows only he was an employee of the Browns" is not the basis for determining that he is not a disinterested director. Accordingly, it is untrue that "[b]ased on these counsel and employee relationships, the majority has held that Modell dominated the board." We did not "rush to judgment," have not "contorted the meaning of 'domination' of a director" and have not "classified all 'inside' directors and all 'outside' directors who serve as attorneys to the corporation as potential defendants." This alleged classification of all "inside" and "outside" directors as potential defendants is a figment of the dissenter's imagination.

I wish to emphasize that I reject the idea that a director is automatically "dominated" by the corporation's chief executive officer merely because that director is outside counsel for the corporation. I say this because a strained construction of Part I B of the majority opinion might raise this unwarranted implication in the minds of some readers.

One dissenting opinion makes the strained assertion that "[t]he majority assumes but does not demonstrate how the Browns' board of directors are all interested and/or on both sides of the transactions at issue." This statement flies into the teeth of the undisputed fact that the four Browns' directors voting yes received a large financial benefit by purchase of their CSC stock at an inflated value and finding of fact No. 33 by the trial judge, amply supported by the record, that "* * * the effect of this transaction was to benefit the majority stockholder of the Browns * * * at the expense of the principal minority shareholders."

Since the trial judge correctly determined that the Browns' board of directors' purchase of the CSC stock was not accomplished by a majority of disinterested and independent directors, there is ample Delaware judicial precedent for holding that the business judgment rule does not protect the transaction and requires application of the intrinsic fairness test. See *Unocal Corp.* v. *Mesa Petroleum Corp.* (Del. 1985), 493 A. 2d 946; *Sterling* v. *Mayflower Hotel Corp.* (1952), 33 Del. Ch. 20, 89 A. 2d 862, affirmed (1952), 33 Del. Ch. 293, 93 A. 2d 107. In this posture of the case, the burden of proof is on the directors to demonstrate the intrinsic fairness to the minority shareholders of the challenged transaction.

*Fliegler* v. *Lawrence* (Del. 1976), 361 A. 2d 218; *Rabkin* v. *Phillip A. Hunt Chemical Corp.* (Del. 1985), 498 A. 2d 1099, 1106. These and other Delaware judicial precedents support paragraph three of the syllabus in the present case.

Further, one dissenting opinion makes a big fetish of the fact that after oral argument in the present case in this court the appellants obtained a temporary injunction in this court to enjoin a company from purchasing the CSC stock from the Browns for the sum of seven million dollars, a price of one million dollars more than the Browns paid for the CSC stock in the transaction challenged here.

That is irrelevant. In determining validity of the Browns' purchase of CSC stock by application of the intrinsic fairness test, the transaction must be examined as of the date on which it was accomplished. *Fliegler* v. *Lawrence, supra.* That was on a date preceding the trial in common pleas court below. We have no right to consider the effect of post-trial judgment offers of purchase on the validity of the judgment of the common pleas court. The temporary injunction issued by this court was necessary to preserve the *status quo* of the case and to prevent any action of the parties from making null and unenforceable the final judgment affirming the common pleas court and reversing the court of appeals.[5] The record does not reveal whether the proposed buyer offering seven million dollars is able to perform, in which case the Browns would once again be vested with the CSC stock subject to our judgment herein. Such a flurry of activity and exercise in futility should be prevented. Civ. R. 65 is applicable only to common pleas courts, not to the Ohio Supreme Court, and is irrelevant to the exercise of our inherent judicial power to accomplish justice. Therefore, the discussion in the dissent of Civ. R. 65, Section 16, Article I of the Ohio Constitution regarding an open court and due process of law, as well as Canon 3A(4) of the Code of Judicial Conduct, is just another irrelevant effort to inflame passions.

Fairness of the transaction to all shareholders is the thread running throughout the cases dealing with corporate governance. Our decision to-

---

[5] *Wagner* v. *Railway Co.* (1882), 38 Ohio St. 32, at paragraph two of the syllabus, held:

"It is within the appellate jurisdiction of the supreme court to allow a temporary injunction where it appears that defendant is doing or threatens to do acts respecting the subject of an action pending, tending to render the judgment ineffectual. *Yeoman* v. *Lasley,* 36 Ohio St. 415, followed and approved."

This is still the law of Ohio. R.C. 2727.05 in pertinent part provides as follows:

"* * * [A]n injunction may be granted before judgment or final order in the action, by the court of appeals in which it is pending or by a judge thereof, when it appears satisfactorily to such court or judge, by affidavit of the party seeking the injunction or his agent, that such party is entitled thereto. Upon like proof, an injunction also may be allowed by the supreme court or court of appeals, or by a judge of either, as a temporary remedy, during the pendency of a case on appeal in such courts."

*Wagner, supra,* and this statute suggest immediate action without response briefs or oral hearing.

day, in holding that the business judgment rule does not protect the challenged CSC stock purchase by the Browns, and in requiring application of the intrinsic fairness test is in the finest tradition of judicial insight. It avoids mixing a conglomeration of corporate legal principles and concepts to reach an absurd and unjust result, thereby sidestepping the preordained results desired by the critics of our majority decision.

Our decision harmonizes with the American Law Institute's Principles of Corporate Governance: Analysis and Recommendations, Tentative Draft No. 5 (April 15, 1986), based largely on Delaware corporate law, where, in reference to an analogous situation, Section 5.02 states:

"Transactions with the Corporation

"(a) *General Rule.* A director [§ 1.08] or senior executive [§ 1.28] who enters into a transaction with the corporation (other than a transaction involving the payment of compensation) fulfills his duty of loyalty to the corporation with respect to the transaction if:

"(1) disclosure concerning the conflict of interest [§ 1.09(a)] and the transaction [§ 1.09(b)] is made to the corporate decisionmaker [§ 1.07] who authorizes or ratifies the transaction; and

"(2) (A) the transaction is fair to the corporation when entered into; or

"(B) the transaction is authorized, following such disclosure, by disinterested directors [§ 1.10], and could reasonably be believed to be fair to the corporation at the time of such authorization; or

"(C) the transaction is authorized or ratified, following such disclosure, by disinterested shareholders [§ 1.11], and does not constitute a waste of corporate assets [§ 1.34] at the time of the shareholder action.

"(b) *Burden of Proof, Ratification of Defective Disclosure.* A party who challenges a transaction between a director or senior executive and the corporation has the burden of proof, except that the director or the senior executive has the burden of proving that the transaction is fair to the corporation if the transaction was not authorized by disinterested directors, or authorized or ratified by disinterested shareholders, following disclosure concerning the conflict of interest and the transaction. The disclosure requirements of § 5.02(a)(1) will be deemed to be satisfied if at any time (but no later than a reasonable time after suit is filed challenging the transaction) the transaction is ratified, following such disclosure, by the board, the shareholders, or the corporate decisionmaker who initially approved the transaction or his successor." *Id.* at 25-26. See *Lewis* v. *Fuqua* (Del. Ch. 1985), 502 A. 2d 962.[6]

---

[6] In Tentative Draft No. 5, *supra,* at 67-68, Section 5.04 provides:

"Use of Corporate Position, Non-public Information Concerning the Corporation, or Corporate Property

"(a) *General Rule.* A director [§ 1.08] or senior executive [Section 1.28] may not advance his pecuniary interest by using his corporate position, material non-public information concerning the corporation, or corporate property in a manner that:

HOLMES, J., dissenting. Through its unfounded, conclusory treatment of both facts and applicable law, the majority has improperly established the intrinsic fairness inquiry as the threshold question for application of the business judgment rule. Accordingly, I must dissent.

In the context of the legal issues presented here, relating to corporate business actions in this state, a court must approach the subject with the threshold presumption of regularity being accorded to corporate decisions via the business judgment rule. The correct inquiry is whether the facts proven at trial sufficiently overcome the legal barrier to whimsical or grudge-based lawsuits. The resultant findings are those of law, which every court of appeals is presumably competent to review. Thus, the majority's use of the "*any* competent, credible evidence" or the "*substantial,* competent and credible evidence" (emphasis added) standards are, at best, misleading. The inclusion of such standards, in fact, demonstrates the reluctance of the majority to stand by its less than convincing legal

---

"(1) causes reasonably foreseeable harm to the corporation or any of its shareholders in their capacity as shareholders; or

"(2) allows him to secure a pecuniary benefit, including a pecuniary benefit received as a shareholder that is not made proportionately available to other shareholders similarly situated, except as permitted by Part VI ('Transactions in Control') unless his conduct is authorized or ratified in accordance with the standards of § 5.02 (Transactions with the Corporation) or § 5.03 (Compensation of Directors and Senior Executives), as the case may be, or, in case of use of corporate property or services, he gives fair value for any benefit received.

"(b) *Burden of Proof; Ratification of Defective Disclosure.* A party who challenges the conduct of a director or senior executive under the standards set forth in subsection (a) has the burden of proof, except that if the conduct was not authorized by disinterested directors [§ 1.10] or authorized or ratified by disinterested shareholders [§ 1.11], in a manner that satisfies the standards of § 5.02 or § 5.03 governing authorization and ratification, the burden is on the director or the senior executive to prove that such conduct was fair to the corporation and its shareholders. The disclosure requirements of §§ 5.02(a)(1) and 5.03(a)(2) will be deemed to be satisfied if at any time (but no later than a reasonable time after suit is filed challenging the director's or senior executive's conduct) the conduct is ratified, following such disclosure, by the board, the shareholders, or the corporate decisionmaker who initially approved the conduct or his successor."

Also, Section 5.10 at 155 provides:

"Transactions with the Corporation

"(a) *General Rule.* A dominating shareholder [§ 1.12] who enters into a transaction with the corporation fulfills his duty of loyalty to the corporation concerning the transaction if:

"(1) the transaction is fair to the corporation when entered into; or

"(2) the transaction is authorized or ratified by disinterested shareholders [§ 1.11], following disclosure concerning the conflict of interest [§ 1.09(a)] and the transaction [§ 1.09(b)], and does not constitute a waste of corporate assets at the time of the shareholder action [§ 1.34].

"(b) *Burden of Proof.* A party who challenges a transaction between a dominating shareholder and the corporation has the burden of proof, except that if the transaction was not authorized or ratified by disinterested shareholders, following such disclosure, the dominating shareholder has the burden of proving that the transaction is fair to the corporation."

analysis, particularly when no analysis is presented which connects the evidence with the legal conclusions drawn therefrom.

Under the applicable Delaware law, the management of corporate affairs is entrusted to the board of directors. *Aronson* v. *Lewis* (Del. 1984), 473 A. 2d 805, 811. "A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose. A court under such circumstances will not substitute its own notions of what is or is not sound business judgment." *Sinclair Oil Corp.* v. *Levien* (Del. 1971), 280 A. 2d 717, 720. The decisions of a board of directors are protected when the majority of voting directors is disinterested, independent, and informed. *Aronson, supra,* at 812-814.

Paragraph two of the syllabus of the majority opinion illustrates the misconceptions of the majority and its abject ignorance of corporate matters. The business judgment rule is a presumption that the director is disinterested, independent and informed. It is also a presumption that the transaction was intrinsically fair to the stockholders. The burden of proof is upon the one challenging the action to prove that the voting directors were interested, not independent or uninformed. Paragraph two of the syllabus by its language, "* * * a director must be * * *," sets forth the above standards as burdens of proof to be shouldered by a director. This fallacy is further aggravated by the language in the opinon that: "If a director fails to pass muster as to any of these three, he is not entitled to the business judgment presumption."

Also contrary to the views expressed by the majority, the "objective reasonableness of the business decision" may not be inquired into merely because the transaction is *"at issue."* (Emphasis added.) Only after the business judgment presumption is *overcome* can the business decision be inquired into at all, and then under an intrinsic fairness analysis. *Sinclair Oil Corp., supra,* at 720. See, *e.g., Unocal Corp.* v. *Mesa Petroleum Co.* (Del. 1985), 493 A. 2d 946, at 954-955; *Aronson, supra,* at 812. In point of fact, the inquiry into the "objective fairness" of a business decision is expressly included as a part of the intrinsic fairness analysis. See, *e.g., Sinclair Oil Corp., supra,* at 719-720. In its rather obvious rush to overcome the lawful presumption of a valid decision by the board of directors, the majority has now blurred the distinction between the business judgment presumption and the intrinsic fairness test.

The majority confusedly cites *Puma* v. *Marriott* (Del. Ch. 1971), 283 A. 2d 693, 695, as requiring that property valuations must be made by independent directors based upon appraisals, etc. "provided by independent experts, whose qualifications are not questioned." Otherwise, it is implied that the interested directors stand "on both sides of the transaction." The analysis in *Puma* concludes that the directors were protected by the business judgment rule.

How different indeed are the legal conclusions the above factors are

cited to support — for it is alleged by the trial court below and quoted by the majority herein that the absence of such factors "did not satisfy any reasonable concept of fair dealing," thus utilizing the factors from *Puma* for the entirely different intrinsic fairness analysis.

As is readily apparent, the majority misread and misinterpreted *Puma, supra,* as well as applicable Delaware law, for no suspicion inures to directors or stockholders because they structure a transaction or fix its terms. After all, this is the primary duty of a director. Instead, the recitation of the pristine character of the voting, independent directors and the basis of their decision-making process in *Puma* was for the mere purpose of pointing to those factors which went unchallenged by the evidence. Since there was presented no other evidence of fraud, the court concluded that the business judgment presumption prevailed. *Id.* at 695.

Through citation of certain trial court opinion language, analysis is misdirected by the majority so as to ascribe importance to the facts that various directors and Browns' officers helped to prepare the transaction before it was presented to the full board; that no arm's-length negotiations as to price, terms, etc., ever took place and, most ridiculous of all, that the board refused to change the purchase price "despite the valuations furnished" by Gries. These factors have no relevance since they fail to demonstrate fraud, any interest of any voting director, except Gries, any self-gain by any voting director, or how the entire board could be on both sides of either transaction. Notwithstanding the majority's alchemical transformation of that which is the ordinary and usually present, into the sinister, nothing presented differs in the slightest from any other well-planned corporate transaction.

The majority assumes but does not demonstrate how the Browns' board of directors are all interested and/or on both sides of the transactions at issue. The many cases cited do in fact demonstrate that the business judgment presumption is shattered where directors are so situated without justification. In *Rabkin* v. *Phillip A. Hunt Chemical Corp.* (Del. 1985), 498 A. 2d 1099, *Fliegler* v. *Lawrence* (Del. 1976), 361 A. 2d 218, and *Greene & Co.* v. *Dunhill Internatl., Inc.* (Del. Ch. 1968), 249 A. 2d 427, the directors whose actions were challenged sat, at the same time, on the boards of directors of the purchasing corporation and the corporation to be purchased or subsidiary corporation. In all of these cases, the shareholders of the subsidiary objected to the prices agreed upon for sale of their stock, and challenged such directors, alleging that they were disloyal to the subsidiary. The present circumstances are not at all comparable to the above cases.

It is clear that there were no interlocking directors whose loyalty could be challenged. It is apparent from the record that the former shareholders of Cleveland Stadium Corporation ("CSC") were never directors of CSC. Consequently, cases based on directors "on both sides of a transaction" are wholly inapposite to the case before us.

Nevertheless, it is posited that the directors benefited from "the

transaction" in that they all received profits from their redemption of CSC stock. Underlying the majority's conclusions is its finding that, as a matter of law, the transactions which occurred on March 2, 1982 and March 16, 1982 were a single transaction.

On March 2, 1982, for the corporate purpose of obtaining complete control of CSC, eighty-percent shareholder Modell directed that all the other shareholders in CSC might redeem their stock for $120 per share instead of the $32 per share provided in their options. All of the shareholders, including Gries, Bailey, Berick, Cole, and Wallack, took advantage of this offer and redeemed their shares of stock.

On March 16, 1982, the board of directors of the Browns met and discussed the merits of acquiring CSC. The wholly business purpose was to allow the Browns to acquire the property and facilities held by CSC for use by the football team. The record shows that ownership of CSC provided the Browns with present ownership of the lease for the stadium, the entire management of various rentals and concessions, and a large property located in Strongsville potentially useful as a future stadium site. A Browns' acquisition of CSC would provide scheduling advantages over other stadium users, plus incredible leverage to either renegotiate terms or extend the present lease of the stadium from the city.

Robert Gries spoke for approximately one and one-half hours in opposition to the acquisition. During that time he presented facts, and stated he had valuations and appraisals, two of which he identified, as contradicting those of Modell. When the vote was taken, Modell and his wife, also a director, abstained from the voting. Directors Bailey, Berick, Cole and Wallack voted to acquire CSC, while Gries voted against the acquisition.

The argument that these two were a single, necessarily related transaction surely strains even the most active imagination. Director Gries has not demonstrated any connection whatsoever between these events which would obligate, require, or motivate any of the former shareholders of CSC to act in any particular way as directors of the Browns. However, as Gries himself demonstrated, one could have received the $120 per share of stock redeemed yet still have voted against the acquisition of CSC. The transactions were also apparently separate for purposes of taxation. Any rule broad enough to metamorphose the above two transactions into one would, of necessity, apply with equal force to disqualify director Gries. Effectively, this would render the Browns' board of directors incapable of considering the acquisition of CSC. Such stance of affairs must then be the point of beginning after the majority decision, since this is an action for rescission of the board's decision. However so, the conclusion that "Modell, Bailey, Berick, Cole and Wallack," and impliedly, Gries, stand on both sides of the transaction is a fundamental misstatement of the law of Delaware.

Particularly troublesome is the inclusion of director Modell as one whose presence on both sides of the transaction destroys the protections of the business judgment presumption. Modell's position is entirely vin-

dicated by the fact that he abstained from voting. However, even if he had voted, the law is clear that if all the other directors were made aware of any advantage he may have gained, then the board's decision would still not be automatically rescindable. Nor do all benefits of directors rise to the level of a disqualifying interest. See, *e.g., Unocal Corp., supra,* at 959; and 8 Del. Code Ann. Section 144(A)(1) in the majority opinion at fn. 2.

The majority asserts that those who own stock and/or hold positions in both corporations automatically stand on both sides of the corporation sufficient to remove the business judgment presumption and allow inquiry into the intrinsic fairness of the transaction. They imply support from *Fliegler* v. *Lawrence, supra; Rabkin* v. *Phillip H. Hunt Chemical Corp., supra;* and *Weinberger* v. *UOP, Inc.* (Del. 1983), 457 A. 2d 701.

The quoted language from *Fliegler, supra,* is quite misleading. There, defendants were directors of the acquiring corporation and owned the principal shares of stock in the corporation which *they voted to acquire.* Because they paid themselves, they were self-interested and consequently stood on both sides of the transaction. In the present case, the directors whose votes are at issue were not directors of the acquired corporation, did not own any part of CSC at the time of the board decision, and did not gain personally from the decision to acquire CSC. In any event, it was not the mere ownership of stock in both corporations that was determinative in *Fliegler;* rather, that by way of such stock, the *directors* stood on both sides of the transaction.

*Rabkin, supra,* also illustrates how directors may be on both sides of a transaction so as to overcome the business judgment presumption. In that case, the decision challenged was the determination to offer minority shareholders of the acquired corporation a lesser amount for their shares than the acquiring corporation had previously paid to obtain majority control. The court there merely determined that dismissal was inappropriately granted because of the existence of several factual issues. The directors who were on both boards of directors may have violated their "undiminished duty of loyalty to" the subsidiary corporation. *Id.* at 1106. There was, however, no finding that the directors were in fact on both sides of the transaction, only what might occur if they had been. See *id.* at 1107, fn. 9. The quotation of such language by the majority must therefore be qualified since the case here had neither a takeover nor a derivative suit by minority shareholders for more money.

Also, the majority misuses the statement from *Weinberger* v. *UOP, Inc., supra,* that defined fair dealing to include "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and stockholders were obtained." This passage is utilized to justify the basis of the trial court holding that because Bailey and Modell initiated, structured, and negotiated the transaction as well as their failure to change the acquisition price in light of valuations furnished by plaintiff, then they

acted unfairly. The *Weinberger* standard enunciated above was, first of all, particular to a cash-out merger or cash buy-out of minority shareholders. While in such circumstances the above factors are all crucially related to whether the minority shareholders were taken advantage of, misled or defrauded of a fair price for their shares of stock, they do not have more than a peripheral bearing on the issue before us. Negotiations, for instance, ought to be arm's length if the shareholders, who are naturally in a more vulnerable position, vis-a-vis the directors, are not to be taken advantage of.

In the present case, negotiations between the directors ultimately devolved into a board vote on the proposed price. Nothing about plaintiffs' complaint is dependent on their weaker position, other than the quite reasonable and often encountered occurrence of a director who is simply out-voted by the rest of the board. In *Weinberger,* the issues were the value given, and whether the board of directors defrauded the shareholders by giving a low price per share. Such standards are nearly useless in determining the question before us, *i.e.,* whether the board of directors paid *too much.* See *Weinberger,* at 712-713.

*Pogostin* v. *Rice* (Del. 1984), 480 A. 2d 619, 624, is incorrectly cited as proof that our sole inquiry is whether "a director * * * has received * * * a personal financial benefit from the * * * transaction which is not equally shared by the stockholders." *Pogostin* involved a shareholder derivative suit wherein the shareholders challenged the payment of executive bonuses to four officer-directors. It was alleged that because these directors voted to receive such bonuses, their self-interest made them interested directors. In such cases, the issue invariably is adequacy of consideration, unless there is no consideration and relatedness between "value of benefits passing to the corporation and the value of options granted." *Id.* at 625. Rather than being a test of general applicability, the quoted standard is a mere threshold question applicable only to those who are directors who participated in the disputed transaction, and whose vote directly resulted in receipt of a benefit not obtained by all the shareholders.

The majority mistakenly refers to the receipt by Gries of $120 per share of CSC stock redeemed as indicating that all the shareholders benefited equally. Had this factor been relevant, such admission would have been fatal. However, no action of the Browns' board of directors was at all involved in the CSC stock redemption. The $120 per share redeemed was an action of CSC's board of directors upon which neither Gries, Cole, Berick, Bailey or Wallack sat. Modell, of course, was the one shareholder who did not receive, and was not permitted to receive, any of the $120 per share. Nor did he vote in the transaction at issue.

The conclusion that directors Bailey, Berick, Cole and Wallack were "interested" because "they had received a personal financial benefit from the challenged transaction" is again pure assumption. It is the demonstra-

tion of a conflict of interest, motivating the directors to vote along the lines of self-interest, which alone will remove the protection of the business judgment rule. See, *e.g., Unocal Corp., supra,* at 955. There was no demonstration of fraud, misrepresentation, deliberate waste of corporate assets, or gross and palpable overreaching. See *Rabkin, supra,* at 1104. Since the directors had obtained a prior redemption of their stock without any further obligation, then as a matter of law and common sense they did not receive any benefit therefrom for later voting to acquire CSC.

Also, it cannot be said that the interests of the affirming directors were enough to disqualify the required majority so as to undo the valid act of the directors. Wallack, Berick and Bailey were officers and/or employees of the Browns. It was contended that their employment with the Browns caused them to be dominated and controlled by director and majority shareholder Modell. The law of Delaware, as stated in *Aronson, supra,* is that the "shorthand shibboleth of 'dominated and controlled directors' is insufficient." *Id.* at 816. The mere assumption that the relationships of the parties as officers and directors resulted in dominated directors is unfounded in corporate law. To accept it as law would doubtless disqualify a great many directors, generally. There was, of course, *no* evidence that these directors' employment status was in any way dependent on their vote. This being the only objection to director Wallack's vote, he was therefore both disinterested and independent.

In order to prove that Berick was dominated and controlled by Modell, the majority relies on *Johnston* v. *Greene* (Del. 1956), 121 A. 2d 919. In that case, the Delaware chancery below found that, by means of dominating the board of directors, the defendant director stole a corporate opportunity. See *Greene* v. *Allen* (Del. Ch. 1955), 114 A. 2d 916. Unfortunately, we are not given a clear analysis as to what factors created the situation of domination and control. The court was, however, not basing its decision on the mere fact of the relatedness of the parties, *i.e.,* not "the manner in which the various director relationships were created." *Id.* at 920. Instead, the court relied on the cumulative effect of the trial record; *i.e.,* "the manner in which the corporate affairs were handled as among the board members showed that realistically this was a one-man board — an Odlum board," and "from the inter-play of several circumstances; some tangible and others intangible." *Id.* Such findings do not, in the slightest, resemble the majority's simplistic analysis that merely because Berick was an officer in the Browns, and functioned accordingly, that he was not an independent director.

Berick's disinterest is further attacked by asserting that he, as outside legal counsel through his law firm, planned and prepared both transactions. As a matter of law, the presence of outside directors enhances the presumption of validity attributable to a director's actions. See, *e.g., Puma* v. *Marriott, supra,* and *Unocal Corp., supra,* at 955. In this case, the fee ultimately paid to Berick's firm for legal services was approximately twen-

ty to twenty-five thousand dollars, which is asserted by appellants to be a financial interest in the outcome of the transaction. It is also asserted that because Modell offered to buy Berick's shares of Browns stock, that Berick was dominated by Modell.

However, the fee for services paid to Berick's firm was not at all dependent on the transactions at issue. Payment was owed and would have been made, despite the outcome of the board's vote. Nor was the law firm dependent on the Browns, since the Browns constituted less than one percent of that firm's business. Also, Berick refused to sell his shares of stock to Modell. Although Berick was enthusiastic concerning the acquisition of CSC, nothing about his opinion indicates anything other than a personal viewpoint. The fact that Berick sits as a director on the boards of a number of corporations, public and private, indicates a professional attitude. Thus, there was no dominance or tainting self-interest in his vote.

The majority fully misstates the law of Delaware by its statement that "Bailey's dual positions as an officer and general counsel for both corporations make him an 'interested' director." There are no Delaware cases which support this view. In fact, the cases utilized by the majority would agree that an interested director is one who is on both sides of the transaction, and who somehow wrongfully receives a benefit.

Bailey, who is in-house counsel to the Browns, is said to be an interested director because he helped to structure the two transactions. It was also alleged that Modell dominated him because he was presented to the board by Modell for the position of director and, at times, Modell sent Bailey to negotiate for him.

The law of Delaware makes it clear that positional relationships, without more, do not rise to disqualification of the director's vote. In the view of the Delaware Supreme Court, "it is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence." *Aronson, supra,* at 816. "Such contentions do not support any claim under Delaware law that * * * directors lack independence." *Id.* at 815. Instead, it must be demonstrated that the directors "through personal or other relationships * * * are beholden to the controlling person. *See Mayer* v. *Adams,* Del. Ch., 167 A. 2d 729, 732 * * *." *Id.*

Of more than passing interest is the use by the majority of the trial court finding that because Bailey "initiated, structured, negotiated and set the price for the sale of CSC," that he was "an interested director." The inquiry as to whether or not a director is disinterested is strictly applicable to the business judgment analysis. *Aronson, supra,* at 814. Yet this also became the basis of the majority's finding that the transaction was intrinsically unfair, citing *Puma, Fliegler, Rabkin* and *Weinberger,*

*supra.* Thus, the majority demonstrates that it lacks expertise in corporate matters, let alone the corporate law of Delaware.

Because of Bailey's position, he would naturally have negotiated for the Browns and, consequently, Modell. He was approved as a director by the entire board, including Gries. At no time was there proof of any self-dealing by Bailey. He personally believed the Browns should acquire CSC so as to control the team's playing facilities. Mere like-mindedness on issues hardly rises to the level of domination or self-interest. Therefore, the decisions of at least three of the affirming directors were entitled to the protection of the business judgment rule.

On the other hand, the vote of director Cole is open to attack. He could have been dominated by Modell through intense financial dependence. Modell had made transactions, promises and guarantees for his benefit.

The majority in effect bases a great number of its conclusions of law on its beliefs that: "[N]o arms'-length negotiations as to price, terms, the elements to be included * * * ever took place between the Browns and CSC" and that Modell did not inform Gries and Cole of his particular plans concerning the two transactions until November 24, 1981. It is, of course, absolutely irrelevant, signifying nothing, whether or not the price ultimately paid was the subject of negotiations. It is the act of the board in approving the transaction and whether such act is presumptively valid which are the objects of inquiry, not the terms, negotiations or other intrinsic fairness analyses. Whether or not Modell ever informed the board members of his plans is clearly a matter within the normal sphere of inner-corporate governance and expertise, and not a subject for judicial Monday morning, armchair quarterbacking.

Ordinarily, there would be no cause to review the intrinsic fairness of the subject transaction since the business judgment rule clearly ought to protect the board's decision to acquire CSC for six million dollars. The majority's simplistic and novel approach to Delaware law on the subject of the business judgment rule is seconded only by its slanted misinterpretation of the transactions at issue. Quite simply, Gries takes the position that CSC was not worth the price paid. The board asserts that it was.

On March 12, 1986, this court received a motion filed within this case seeking an injunction by Gries against the board of directors, requesting that the board be enjoined from selling CSC (now called Clesta, Inc.) to another corporation. The purchase price offered is seven million dollars. The position now adopted by appellants is that CSC had not been sufficiently appraised. This backhanded admission that CSC may be presently worth more than the offered seven million dollars is out of harmony with appellants' argument on the merits before this court. It certainly undermines the majority's finding that the transaction was somehow unfair.

Accordingly, I would affirm the court of appeals.

DOUGLAS, J., concurs in the foregoing dissenting opinion.

DOUGLAS, J., dissenting. I am disturbed that a majority of this court feels constrained to put themselves in the position of acting as a "super" board of directors of a corporation. Appellees principally argued this case in the lower courts on the basis of the business judgment rule because said rule so obviously applies. It is my guess that had a majority of this court either agreed with the decision made by the board of directors or looked favorably on the party urging application of the rule, they would have had little difficulty in finding that the rule applies in this case. Certain members of the majority are fond of talking about preordained results. Now it is clear why they are able to speak with such authority on the subject.

While it is clear to me, for reasons expressed by others, that the business judgment rule applies, I write in dissent for another reason. Appellants originally brought this action contending that the $6,000,000 price paid by the Cleveland Browns Football Company, Inc. ("Browns") for all of the stock of the Cleveland Stadium Corporation ("CSC") was excessive and thus unfair to minority shareholders in the Browns. The suit also contended that majority shareholder and chief executive officer, Arthur B. Modell, had engineered the transaction by exercising his influence over the members of the board of directors who voted in favor of the purchase.

Confirming this, appellants' merit brief in this court states, in part, that "* * * plaintiffs opposed the acquisition on the ground that the $6,000,000 price was *at least* $4,000,000 too high and, after the acquisition was approved by the Browns [*sic*] directors (on March 16, 1982), instituted the present action." (Emphasis *sic*.) Appellants' brief also states that "[a]fter a four-week trial in the summer of 1984, Common Pleas Court Judge John Angelotta voided the transaction on the ground that the $6,000,000 price was not 'fair' to the corporation (or the minority shareholders) and that the 'manner in which the subject transaction was initiated, structured, negotiated and disclosed to plaintiffs * * * did not satisfy any reasonable concept of fair dealing.' "

Thus, it is clear the appellants' cause of action is founded on the fact that the Browns paid too much for the stock of CSC, that the purchase price of $6,000,000 was unfair and was, at least, $4,000,000 too high.

Such contentions and statements, on their face, appear to raise legitimate concerns and thus on appeal to this court it became necessary to wrestle with the intricacies of the transaction. In doing so, I found myself being torn between the Delaware law concerning the business judgment rule and the findings of the trial court that the transaction was clearly unfair to appellants. Then, while the case was pending in this court on appeal, an event occurred that brought, at least for me, the entire transaction and the majority opinion into sharp focus.

On March 12, 1986, as part of the within case, appellants filed with this court a "Motion for Temporary Injunction." Appellants sought to enjoin the sale, by the Browns, of the stock in question. Apparently a com-

pany, owned in part by Modell, offered to purchase the CSC (now "Clesta, Inc.") stock from the Browns for the sum of $7,000,000. By seeking the injunction, appellants were attempting to stop a sale of the disputed stock for $1,000,000 more than the Browns had paid for the stock and an amount that was *at least* $4,000,000 more than appellants contended the stock was worth. If the unfairness of the original transaction was really what was concerning appellants, it would seem that the proposed sale was to their benefit and would have settled the entire controversy.

That this was apparently not what this case was all about became even more clear when appellants' injunction motion, filed March 12, 1986, was delivered to my office at 10:45 a.m. on March 13, 1986 and I was asked to vote on it on the same day. I respectfully suggested that we wait at least until the next day to give appellees a chance to respond by way of brief or memorandum. I was informed that the vote would be released that same day at 3:30 p.m.

I voted "no" on the motion. I did so, in part, because of the following: (1) Section 16, Article I of the Ohio Constitution reads: "All courts shall be *open,* and *every* person, * * * shall have remedy by *due course of law,* and shall have justice administered without *denial* * * *." (Emphasis added.) (2) Civ. R. 65(C) reads, in part: *"[N]o temporary restraining order or preliminary injunction is operative* until the party obtaining it gives a bond executed by sufficient surety, approved by the clerk of the court granting the order or injunction, in an amount fixed by the court or judge allowing it, to secure to the party enjoined the damages he may sustain, if it is finally decided that the order or injunction should not have been granted." (Emphasis added.) (3) Civ. R. 65(B)(1) reads: *"[N]o* preliminary injunction shall be issued without *reasonable notice* to the adverse party. * * *" (Emphasis added.) (4) Civ. R. 65(D) provides, in part: *"[E]very* order granting an injunction and *every* restraining order shall set forth *the reasons for its issuance*; shall be specific in terms * * *." (Emphasis added.) (5) Canon 3A(4) of the Code of Judicial Conduct provides, in part: "A judge should accord to every person who is legally interested in a proceeding, or his lawyer, *full right to be heard* according to law * * *." (Emphasis added.)

Appellees were denied an open court and were not accorded remedy by due course of law. No bond was offered by appellants nor did this court require or even fix a bond to be posted by appellants. Reasonable notice was not given to appellees of the issuing of the injunction and no reasons were given for its issuance. Appellees were not given full right to be heard and, in fact, the court did not even have the benefit of appellees' counsels' arguments in opposition to the request for injunction. In short, it seemed to be a strange, as well as unfair, way to proceed.

After reviewing the original testimony, the law on the business judgment rule and the subsequent happenings in this court, I have concluded

that the court of appeals was correct in its perceptive analysis and I would affirm the judgment of that court.

Accordingly I dissent herein.

WRIGHT, J., concurs in the foregoing dissenting opinion.

WRIGHT, J., dissenting. I concur in Justice Holmes' dissent, but must add a number of additional observations. I concur in the syllabus law of this case but I feel that the majority's misapplication of the law to the facts is a travesty. I am troubled by the prospect of serious damage to the fabric of corporate law which will surely result from the majority's opinion. Even a casual observer is aware of the growing crisis facing corporations in recruiting capable women and men to manage corporate affairs. The majority's decision will exacerbate this problem.

## I

The Delaware business judgment rule provides that a board of directors' decision will not be disturbed absent a specific showing of a breach of fiduciary duty such as self-dealing, interest, domination, or lack of good faith. A hallmark of the business judgment rule is that a court will not substitute its judgment for that of a board if the latter's decision can be "attributed to any rational business purpose." *Sinclair Oil Corp.* v. *Levien* (Del. 1971), 280 A. 2d 717, 720. The party challenging the director's decision bears the burden of rebutting the presumption that the decision was a proper exercise of business judgment by the board. The majority is clearly in error when it states: "However, when the justification of a particular transaction is at issue, such as in the case at bar, the language of the cases suggests a standard of judicial review whereby the court must weigh the objective reasonableness of the business decision." This is just plain wrong. Under Delaware law, an inquiry into the "intrinsic fairness" of a particular transaction is not appropriate until the court makes a threshold determination that the claimant has made a particularized showing of interest, domination, or lack of good faith.

In the leading case of *Aronson* v. *Lewis* (Del. 1984), 473 A. 2d 805, the court discussed the availability, function and operation of the business judgment rule, including the standard by which director conduct is judged. At page 810, the court cited with approval the following:

"[']* * * To properly allege domination of the Board, particularly domination based on ownership of less than a majority of the corporation's stock, in order to excuse pre-suit demand, [the complaint] must allege ownership plus other facts evidencing control to demonstrate that the Board could not have exercised its independent business judgment.[']"

Quoting from *Kaplan* v. *Centrex Corp.* (Del. Ch. 1971), 284 A. 2d 119, the *Aronson* court stated, " '[s]tock ownership alone, at least when it amounts to less than a majority, is not sufficient proof of domination or

control.' " *Id.* at 815. Moreover, the court stated, "in the demand context even proof of majority ownership of a company does not strip the directors of the presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation. There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person." *Id.* Further, the court stated that "it is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention, and sense of individual responsibility to the performance of one's duty, not the method of election, that generally touches on independence. We conclude that in the demand-futile context a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.' " *Id.* at 816. (Citing *Kaplan, supra,* at 123.) Under Delaware case law, this need for particularity is critical in determining whether the inference of domination or interest is sufficiently substantiated.[7]

Appellants fail to show how the particular business affiliations between Modell and Berick, or Modell and Wallack were so influential as to prevent them from basing their decisions on the best interests of the corporation. All the record shows regarding the claim of domination against Berick was that his firm, one of Cleveland's most respected law firms, performed legal services for the Browns. Courts have long recognized the appropriateness of having lawyers — including lawyers who receive legal fees from the corporation — sit on boards of directors. If such circumstances disqualify a director, the personnel of a great many, if not most, American corporations would have to be reconstituted. As stated in *Piccard v. Sperry Corp.* (S.D.N.Y. 1943), 48 F. Supp. 465, 469, affirmed (C.A. 2; 1946), 152 F. 2d 462, certiorari denied (1946), 328 U.S. 845 (applying Delaware law):

"The widespread practice of having corporate attorneys and employees on boards of directors does indicate a fairly universal acceptance by the bar of the proposition that such relationships do not disqualify."

The record regarding Nate Wallack, who passed away in January

---

[7] See *Pogostin v. Rice* (Del. 1984), 480 A. 2d 619 (It is the plaintiff's burden to allege with particularity that the improper motive in a given set of circumstances, *i.e.,* perpetuation of self in office or otherwise in control, was the sole or primary purpose of the wrongdoer's conduct.); *Bergstein v. Texas Internatl. Co.* (Del. Ch. 1982), 453 A. 2d 467 (The allegations of interest or domination must be supported by specific factual allegations.); see, also, *Kaplan v. Centex Corp.* (Del. Ch. 1971), 284 A. 2d 119; *Chasin v. Gluck* (Del. Ch. 1971), 282 A. 2d 188; *Puma v. Marriott* (Del. 1971), 283 A. 2d 693; *Mayer v. Adams* (Del. Ch. 1961), 167 A. 2d 729, affirmed (1961), 174 A. 2d 313.

1984, shows only that he was an employee of the Browns. The mere fact that he worked for the Browns does not indicate that he was dominated by Modell, nor that he lacked the "care, attention and sense of individual responsibility" required to make an independent decision. See *Aronson, supra,* at 816. See, also, *Blish* v. *Thompson Automatic Arms Corp.* (Del. 1948), 64 A. 2d 581, 606; *Kaufman* v. *Beal* (Feb. 25, 1983), Del. Ch. Civil No. 6485, at 11 ("Nor does the *mere* * * * serving as an officer of a corporation demonstrate control or domination." [Emphasis added.]). Based on these counsel and employee relationships, the majority has held that Modell dominated the board. The mere existence of such business affiliations has been determined to be insufficient to establish domination. *Maldonado* v. *Flynn* (C.A. 2, 1979), 597 F. 2d 789, 794 (applying Delaware law); *Abramson* v. *Nytronics, Inc.* (S.D.N.Y. 1970), 312 F. Supp. 519, 532 (applying Delaware law); *Kors* v. *Carey* (Del. Ch. 1960), 158 A. 2d 136, 142-143. Cf. *In re General Tire & Rubber Co. Securities Litigation* (C.A. 6, 1984), 726 F. 2d 1075, 1084, certiorari denied (1984), 83 L. Ed. 2d 120 (applying Ohio law).

Appellants essentially claim that Modell is a majority shareholder and a member of the board of directors for the Browns, and that other board members agreed with him in approving the acquisition. The presumption of propriety afforded by the business judgment rule is not overcome just because a board, not otherwise disqualified, approves a transaction benefiting a stockholder who holds a substantial interest in the corporation. Domination cannot be manufactured; it must be drawn from the facts presented. There is no presumption that directors are controlled; the issue is instead intensely factual. There *is* a presumption, however, that directors act in good faith and in the best interests of the corporation. *Warshaw* v. *Calhoun* (Del. 1966), 221 A. 2d 487, 492-493; *Prince* v. *Bensinger* (Del. Ch. 1968), 244 A. 2d 89, 94. In its rush to judgment, the majority has contorted the meaning of "domination" of a director and has classified all "inside" directors and all "outside" directors who serve as attorneys to the corporation as potential defendants in any contested corporate reorganization or acquisition.

## II

Appellants have not alleged that any director other than Modell was financially interested in the challenged transaction. Modell abstained from voting on the proposed acquisition; therefore, any interest on his part could not support appellants' cause of action. There is simply no way to support a holding that any of the directors who participated in the transaction had an "interest" in the outcome of the transaction. Appellants never pleaded this theory in their original complaint or their amended complaint. The first time that this theory was proposed was in the findings of fact presented by appellants so late in the proceeding as to preclude it from being the subject of argument or consideration. A finding of interest is simp-

ly impossible on the basis of this record. Further, appellant Robert Gries' own admissions and pleadings belied a finding of interest, because he testified that the redemption of the CSC stock was *not* dependent on the Browns' later acquisition of CSC.

In an effort to show interest, the majority intimates that Berick and Wallack stood on both sides of the transaction. The majority's position is manifestly untenable. Neither of these directors stood on both sides of the transaction, because at the time of the vote on the proposed acquisition on March 16, 1982, Berick was no longer a shareholder of CSC. There is no substantial evidence in the record that Wallack was ever a shareholder in CSC. In the absence of divided interests, the judgment of the majority stockholders and a board of directors is presumed to be made in good faith and inspired by a bona fide purpose. *Greene* v. *Dunhill Internatl., Inc.* (Del. Ch. 1968), 249 A. 2d 427.

The redemption was final and irrevocable on March 2, 1982. Robert Gries admitted on cross-examination that the redemption was not conditioned on or dependent upon the later purchase by the Browns. Indeed, appellants' receipt of $408,000 from the redemption is proof that the proceeds were in no way tied to an affirmative vote on the acquisition. If one thing is clear, it is that directors are only "interested" if it has been demonstrated that they would have received financial gain from the challenged transaction. *Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc.* (Del. 1986), 506 A. 2d 173, quoting *Cheff* v. *Mathes* (Del. 1964), 199 A. 2d 548, 554; *Pogostin* v. *Rice, supra.* The record is devoid of any evidence on this point. The trial court's conclusion that there was "interest" is clearly erroneous and was properly reversed by the court of appeals.

As analyzed in depth by Justice Douglas' dissent, the majority's discussion of the intrinsic fairness of the acquisition merely parrots the posture of the trial judge and entirely disregards the sale for $6,000,000. I conclude that, because the transaction was accomplished as a result of the exercise of independent business judgment, the court of appeals' decision should be affirmed.

DOUGLAS, J., concurs in the foregoing dissenting opinion.